JOHNSON, Justice.*
I,We granted this writ application to consider whether the doctrine of contra non valentem applies to suspend the ten year liberative prescriptive period applicable to an action by the mineral interest owners against the operator of a unit well who has failed to pay the owners their share of proceeds for mineral production. Wells v. Zadeck, 11-1232 (La.10/12/11), 74 So.3d 212.
For the reasons that follow, we conclude the doctrine of contra non valentem applies to suspend the running of prescription because the mineral interest owners did not know nor reasonably should they have known of the mineral production until December 19, 2008.
FACTS
On September 17, 1949, James P. Wells and Olean Speights Wells executed a cash deed in favor of Paul and Cleo Holmes conveying 120 acres of property situated in *1147 DeSoto Parish, Louisiana. In the sale of the property to Mr. and Mrs. Holmes, Mr. and Mrs. Wells established a mineral servitude by reserving an undivided one-half interest in the mineral rights on the property. In the 1950s, James and Olean Wells divorced; and pursuant to their community property 12settlement, they divided the servitude with each party retaining ownership of an undivided one-fourth mineral interest in the property.
On June 5, 1954, Mrs. Wells executed a mineral lease in favor of Z.T. Gallion, pursuant to which a well was drilled on the property. The lease was released on June 26, 1958 because the well resulted in a dry hole. In 1961, the Holmes family executed a mineral lease with Parnell, Inc., Zadeck’s predecessor in interest, covering lessors’ “entire undivided one-half interest in and to” the property. The property was then included in the Paluxy Sand Unit U, a unit in which the Shirey Well No. 1 achieved production in January, 1965, and continued producing through 2007.
Mrs. Wells died in 2002, and her servitude was inherited by her son, the Plaintiff, James P. Wells, Jr., and his sister, Martha C. Perser, who is not a party to this lawsuit. On December 19, 2008, James P. Wells, Jr. (“Wells”) was contacted by Bill Dempsey, a landman representing Comstock Resources, concerning a lease of his mineral interest. Thereafter, Wells discovered the long history of production involving the servitude and filed this lawsuit.
On December 18, 2009, Wells filed suit against Defendants Donald Zadeck and Zadeck Energy Group, Inc. (hereinafter referred to collectively as “Zadeck”), Ole-um Operating Company, L.C., and T.M. Hopkins Operating, Inc. and T.M. Hopkins, Inc., who all allegedly conducted oil and gas exploration and production activities from his unleased unitized acreage, for their failure to tender unto him and/or his mother their rightful share of proceeds from the production. In response, Zadeck filed a Peremptory Exception of Prescription, urging that according to LSA-C.C. art. 3499, Wells’ claim to recover payment is a claim in quasi contract that prescribed ten years from Zadeck’s cessation of involvement |swith the Shirey Well No. 1. Zadeck admitted that it was the operator of the Shirey Well No. 1, but contended its ownership interest ended on September 3, 1994, when it sold all of its rights in the well to T.M. Hopkins, Inc. It maintained that thereafter, it had no further involvement with the Shirey Well No. 1. Zadeck maintained that Wells failed to file his suit until fifteen years after Zadeck ceased service as operator of Shirey Well No. 1. It argued that any claims urged by Wells can only revert back to December 18, 1999; therefore, Wells’ claims against Zadeck are prescribed. The present exception of prescription involves defendant Zadeck only.
In response to Zadeck’s exception, Wells argued that the doctrine of contra non valentem applies to suspend the running of prescription since he had no knowledge of the existence of the mineral interests or production until December 19, 2008. Wells contended that his ignorance was not attributable to any fault of his own, and he clearly exercised due diligence in discovering the relevant facts once he learned that he owned the mineral interests.
On May 11, 2010, at the hearing on the Exception of Prescription, the parties stipulated that Zadeck ceased ownership and service as operator of the Shirey Well on September 3, 1994. Since the lawsuit was filed more than fifteen years after the cessation of that service as operator, the burden then shifted to the Plaintiff to overcome the presumption of ten year li-berative prescriptive, based on the stipulation. At the hearing, Wells testified that *1148 he was unaware of the mineral reservation until he received a phone call from a land-man for Comstock Resources. He immediately traveled to Shreveport, Louisiana, researched the records at the Office of Conservation, and discovered that there had been production on the subject property. Wells also testified that after his parents’ |4divorce in the 1950s, his mother raised him and his sister as a single parent on a minimum wage salary while riding the trolley to work, as she could not afford an automobile. He testified that had his mother been receiving additional income from the mineral interest, it would have been an event of significance in his household and he surely would have been aware of it. He further testified that at the time of the hearing, both his parents were deceased. His father’s one-fourth interest had been conveyed to Stan Lewis; thus, only his mother’s one-fourth interest is at issue. Wells testified that after his parents divorced his mother remarried twice, first to John Morris and then to Lewis English. Mrs. Wells died intestate. Her survivors are her son, the Plaintiff, and his sister, who is not a party to this suit.
After hearing the arguments from both sides, the trial court granted Zadeck’s peremptory exception of prescription and dismissed Wells’ claims against Zadeck with prejudice. The court of appeal summarized the trial court’s reasoning as follows:
[The Court] granted Zadeck’s peremptory exception of prescription on two bases: 1) as a result of Wells’ mother’s failure to monitor her mineral interests, which in effect is a finding that the Wells family (including Plaintiff) failed to exercise reasonable diligence regarding the mineral activity on the Property, and 2) Wells’ failure to prove that some reason external to his own will led to his or his mother’s ignorance of the fact that they had a cause of action they could pursue.
The trial court accepted that Plaintiff “had no knowledge of the unrecognized mineral interest until December 19, 2008, and that there was no reason for him to suspect he had mineral rights that were not being recognized.” The court reasoned that Mrs. Wells leased the property in 1954, and “[h]er failure to monitor her own mineral rights has passed to her son.” Wells’ present claim is the same claim his mother could have brought in 1965 when the Shirey Well was | ¿producing. The trial court noted that Wells failed in his burden to present evidence that Zadeck intentionally deprived his family of the knowledge of the mineral interests. The trial court also reasoned:
Presumably, there was an assumption by the original operator or producer of the Shirey Well that James P. Wells’ and Olean Speights Wells’ mineral interests reverted to the surface owner because of 10 years without production in paying quantities. This court’s presumption further assumes that the original operator was not aware of the P.F. Holmes dry hole well which interrupted the 10 year prescription period of non-use. R.S. 31:29 The court is making these assumptions to explain the lack of evidence as to the original operator’s bad faith.
Relying on LSA-C.C. art. 3499, the trial court found this to be a personal action subject to a liberative prescription period of ten years. The court granted Zadeck’s Exception of Prescription and dismissed Wells’ claim against Zadeck.
The court of appeal agreed that Wells failed to present any evidence that his mother, who executed the mineral lease of 1954, and later released that lease, exercised due diligence to protect her mineral interest. Wells v. Zadeck, 46,138 (La.App. 2 Cir. 4/13/11), 62 So.3d 861. The court reasoned that Mrs. Wells was familiar with *1149 leasing and drilling activity based on the fact that she signed a single mineral lease in 1954, yet she remained silent and inactive for more than 40 years. The court attributed the ignorance of. a potential claim to Mrs. Wells’ own neglect and reasoned that Mrs. Wells could have learned of the mineral production by exercising reasonable diligence in protecting her interests, i.e., some reasonable inquiry or action was required from her. The' court “decline[d] to create a brightline rule regarding what actions might be considered reasonably diligent in protecting such interest.” Id. 46, 138 at p. 7, 62 So.3d at 866.
Judge Brown, in his dissent, took issue with the majority’s repeated characterization of Mrs. Wells as someone who was familiar with the exploration, | pleasing, and drilling processes as a result of her onetime execution of a mineral lease.
Not only did she execute the lease contemporaneously with Mr. Wells, which could indicate her reliance on his mineral leasing knowledge, but the particular well drilled as a result of the lease was actually drilled on the Property. Meanwhile, in the present case, the completed well was not on the 120 acres in which Mrs. Wells had an interest, but was located on a different tract within the drilling unit. To try to equate the knowledge needed to execute a mineral lease where a well will be drilled on the actual property you have an interest in, to being familiar with the complexities involved in a forced pooled unit, is quite an overreach.
Id., 46,138 at p. 4, 62 So.3d at 868-69.
DISCUSSION

Prescription

Louisiana jurisprudence provides that a claim against the operator of a unit well brought by the owners of unleased mineral interests in the production unit seeking their statutory share of production from the well is grounded in quasi-contract, and thus, the claim is subject to liberative prescription of ten years. See Taylor v. Smith, 619 So.2d 881 (La.App. 3 Cir.1993), writ denied, 625 So.2d 1038. A quasi-contractual relationship is created between the unit operator and the un-leased mineral interest owner with whom the operator has not entered into contract. This relationship is personal and heritable. King v. Strohe, 98-656 (La.App. 3 Cir. 5/8/96), 673 So.2d 1329, 1339. LSA-C.C. art. 3499 provides that “[ujnless otherwise provided by legislation, a personal action is subject' to a liberative prescription of ten years.” Accordingly, this claim is subject to a liberative prescriptive period of ten years. '

Burden of Proof

An exception of prescription must be specifically pleaded and may not be supplied by the court. LSA-C.C.P. art. 927(B). Generally, prescription statutes are |7strictly construed against prescription and in favor of the claim sought to be extinguished by it; thus, of two possible constructions, that which favors maintaining, as opposed to barring an action, should be adopted. Carter v. Haygood, 04-0646 (La.1/19/05), 892 So.2d 1261, 1268; Bailey v. Khoury, 04-0620 (La.1/20/05), 891 So.2d 1268.
The rules of prescription are designed to prevent old and stale claims from being prosecuted. Ordinarily, the exceptor bears the burden of proof at the trial of the peremptory exception. Campo v. Correa, 01-2707, p. 7 (La.6/21/02), 828 So.2d 502, 508. However, if prescription is evident on the face of the pleadings, the burden shifts to the plaintiff to show the action has not prescribed. Campo, 01-2707 at p. 7, 828 So.2d at 508; Williams v. Sewerage & Water Bd. of New Orleans, 611 So.2d 1383, 1386 (La.1993). In the *1150 absence of evidence, the objection of prescription must be decided upon the facts alleged in the petition, and all allegations contained therein are accepted as true. LSA-C.C.P. art. 931 provides in pertinent part that “... evidence may be introduced to support or controvert any of the objections pleaded, when the grounds thereof do not appear from the petition.”
In the case at hand, according to Wells’ petition, his unleased mineral interests were included in an unitized zone established by the Louisiana Office of Conservation. The petition also states that despite the inclusion of Wells’ mineral interests, Zadeek and other unit operators failed to pay him his share of proceeds from the production from the involved unit well. It is clear that Zadeek ceased operation in 1994, and this suit was not filed until 2009; therefore, applying LSA-C.C. art. 3499, the claims against Zadeek appear prescribed on the face of the petition. Accordingly, we must determine whether Wells has carried his burden of | ^proving that prescription had been sufficiently suspended, so as to bring his action.

Contra Non Valentem

Although LSA-C.C. art. 3467 provides that “prescription runs against all persons unless exception is established by legislation,” Louisiana jurisprudence has long recognized the doctrine of contra non valentem as a means of suspending the running of prescription when the circumstances of a case fall within one of four categories. See Frank L. Maraist and Thomas C. Galligan, Louisiana Tort Law § 10-4(b), 222 (1996). Contra non valen-tem non cumt praescriptio means that prescription does not run against a person who could not bring his suit. Harvey v. Dixie Graphics, Inc., 593 So.2d 351, 354 (La.1992); see also, Cartwright v. Chrysler Corp., 255 La. 597, 232 So.2d 285, 287 (1970). This Court has recognized that the doctrine of contra non valentem is used to soften the occasional harshness of prescriptive statutes. Carter v. Haygood, 04-646 (La.1/19/05), 892 So.2d 1261,1268.
In Plaquemines Parish Commission Council v. Delta Development Company, Inc., 502 So.2d 1034, 1056 (La.1987), this Court held that “[tjhere is no question but that contra non valentem continues to be a viable exception to the running of libera-tive prescription in Louisiana.” This Court recognized the four instances where contra non valentem can be applied to prevent the running of prescription: (1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiffs action; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing |9himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant. These categories allow “the courts to weigh the ‘equitable nature of the circumstances in each individual case’ to determine whether prescription will be tolled.” Id. at 1054, 1055.
The court of appeal relied on Marin v. Exxon Mobil Corp., 09-2368 (La.10/19/10), 48 So.3d 234, and determined that the fourth category of contra non valentem, commonly referred to as the “discovery rule,” is at issue. The court additionally found that Wells was required to show that his ignorance of his cause of action was not attributable to his own willfulness or neglect.
In Marin, sugarcane farmland owners sued Exxon for damages when their lands were contaminated by oilfield wastes deposited in unlined earthen pits. Exxon argued that Plaintiffs’ claims had pre *1151 scribed because they were or should have been aware of the contamination as early as 1991, yet did not file suit until 2003. This Court held that by 1995, the dying sugarcane on Plaintiffs’ land put them on sufficient notice of the possible contaminants and that it was unreasonable for the Plaintiffs to wait eight years to file suit. Id. at 251.
In Marin, this Court described the knowledge sufficient to start the running of prescription under the fourth category of contra non valentem as constructive knowledge, or the ‘“acquisition of sufficient information, which, if pursued, will lead to the true condition of things.’” Marin, 09-2368 at 13-14, 48 So.3d at 246. According to Marin, “the ultimate issue in determining whether a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiffs action or inaction in light of his education, intelligence, and the nature of the defendant’s conduct.” Marin, 09-2368 at 15, 48 |10So.3d at 246.
Using this test for constructive knowledge, this Court in Marin examined the reasonableness of the plaintiffs’ actions in light of the knowledge they possessed. The Court cited a litany of facts within the plaintiffs’ knowledge and then asked: “As plaintiffs took no further action upon learning that sugarcane would not grow in certain areas, that something in the soil was causing the sugarcane not to grow, and that Exxon was responsible for this damage, was their inaction reasonable in light of their education, intelligence, and the nature of the defendant’s conduct?” Marin, 09-2368 at 18, 48 So.3d at 248-249.
In the instant case, the lower courts clearly failed to follow the blueprint set forth in Marin. Rather than looking to the record for evidence of facts within plaintiffs knowledge and then examining the reasonableness of plaintiffs inaction in light of those facts, considering plaintiffs education, intelligence and the nature of defendant’s conduct, the Court of Appeal held that contra non valentem does not apply here solely because the “record is devoid of evidence of any efforts on the part of Mrs. Wells to keep abreast of the mineral activity on the Property.” According to the reasoning of the Court of Appeal, Mrs. Wells’ execution of a mineral lease in 1954 and her subsequent release of that lease in 1958 (after the well that was drilled on the 120 acres in which she had an interest proved to be a dry hole) was knowledge sufficient to alert her to a possible claim for production from a well, not on the 120 acres in which she had an interest, but on a different tract, drilled after the lease she executed was released.
The undisputed facts in this record establish: plaintiff, Mr. Wells, had no knowledge of the mineral production until 2008, when he was contacted by a landman; his mother, Mrs. Wells, executed a mineral lease in 1954, but released it Inin 1958 when the well that was drilled resulted in a dry hole; thereafter Mrs. Wells moved to Shreveport. Production resulted in 1965 after unitization and drilling of a well on property outside the 120 acres in which Mrs. Wells held mineral interests. She did not receive “one penny” from the production on the unit.
Based on these facts, the trial court in this case found that plaintiff “had no knowledge of the unrecognized mineral interest until December 19, 2008, and that there was no reason for him to suspect he had mineral rights that were not being recognized.” The Court of Appeal found that “[w]hen Zadeck conducted a search of the public records in connection with the leasing of the Property, the one-fourth interest of Mrs. Wells was not discovered by Zadeck and Mrs. Wells was not provided notice of the mineral activity on the property.”
*1152 Consistent with Marin, given these facts, the inquiry should have been: As plaintiff took no further action after signing and then releasing the lease covering her 1/4 mineral interest, was her inaction after 1958 reasonable in light of her education, intelligence, and the nature of defendant’s conduct? The reasonableness of the plaintiffs actions centers upon the knowledge she possessed. Wells argues that neither he nor his mother had knowledge that the drilling production was ongoing, since Zadeck failed to tender production payments for unleased mineral interests.
In support of his position, Wells relies upon Amoco Production Company v. Texaco, Inc., 02-240 (La.App. 3 Cir. 1/29/03), 838 So.2d 821, writ denied, 03-1104 (La.6/6/03), 845 So.2d 1096, which held that the doctrine of contra non valentem halts the running of prescription when the plaintiff was indeed prevented from filing its claim under one of the four categories listed above. The facts of that case are accurately summarized by Judge Brown in his dissent:
|]2In Amoco, supra, Amoco, a major oil and gas corporation, subleased five of its leaseholds in Vermillion Parish. The contract executed by the parties contained a “reassignment clause,” whereby the defendants, one of which was IMC, were not to allow the cancellation of any of the leases without providing notice to Amoco at least 60 days in advance. In 1976 the defendants allowed one of the leases to expire, and in 1981 the defendants released then nonproducing acreage from the other four leases. The defendants subsequently took new leases in their names on these properties. In 1993 Amoco hired a landman to audit its properties being operated by outside companies such as the defendants. This audit led to the discovery of the lease cancellations 18 and 13 years prior.
Defendant IMC argued that Amoco should have discovered the lease cancellations earlier because they were recorded in the Vermillion Parish public records, and thus, Amoco failed to exercise reasonable diligence such as would entitle it to claim the benefit of contra non valentem. The Court of Appeal rejected that argument out of hand, finding that in all of the cases in which the courts found a duty on the part of a plaintiff to investigate the public records, the plaintiff had been placed on notice of a possible injury. Siding with Amoco, the Court of Appeal concluded that “these cases do not apply to an unsuspecting plaintiff, who has no notice of the potential claim as a direct result of defendant’s failure to provide information it was required by contract to furnish.” Amoco, 02-240 at p. 11, 838 So.2d at 831. The Court of Appeal explained: “The law of prescription references what a plaintiff knew or should have known about his potential cause of action not what he could have known.” Id. at 831-832 (italics in original).
The court found persuasive Amoco’s argument that requiring a continuous search of the public records would place an unreasonable burden on a company:
[T]o police every single release, like the ones that were taken here, of every override in all of the parishes of Louisiana and all of the eastern half of the United States that Amoco’s New Orleans office was in charge of, we would have had to have sent an army of people into | 1severy courthouse, looking for the thousands of leases and overriding royalty interests out there, just to verify that each and every one of those leases or any one of them had not been released. And we had thousands of overrides, not just this one.
Id. at 831. The court found “nothing in the jurisprudence which places such a *1153 heavy burden on a company -without some prior notification of a possible problem.” Id. The court reasoned that Defendants failed to give Amoco the proper notification that it was required to furnish by contract and thus could not take advantage of that lack of notice to claim the benefits of prescription.
According to LSA-R.S. 30:10(A)(3), as an operator of a forced pooling unit, Za-deck was required to remit to Mrs. Wells her “pro rata share of the proceeds of the sale of production within 180 days of such sale.”[1] However, the record | ^establishes that Zadeck failed to perform its affirmative statutory duty by not tendering to Mrs. Wells her pro rata share of the production proceeds. Clearly, when Zadeck acquired the Holmes lease, securing only a half interest in the minerals underlying the property, it was well aware that someone or some entity other than their lessee owned the other undivided one-half interest.
Although Amoco involved a contractual obligation between two sophisticated oil companies and the obligation here is a statutory one between an operator and a mineral interest owner, the same principles are applicable. An unleased mineral interest owner, who was minimally educated and not living in the same parish where the subject unit well was located, should not be required to continuously search the public records, make cold calls, or investigate the possibility of a unit well not located on the property subject to the mineral servitude. The record in this case establishes that Mrs. Wells, like the plaintiff in Amoco, was not put on notice of a possible *1154 injury because she never received payment from production, although such was clearly required by statute. In this case involving unleased mineral interests included in a producing unit, there is a statutory burden on this defendant, who has an affirmative obligation to pay. Here, as in Amoco, the defendant’s neglect of that duty or failure to diligently perform it (whether wilful or negligent) is a factor to consider in assessing the reasonableness of plaintiffs conduct, given her intelligence and situation. Moreover, despite the Court of Appeal’s unsupported conclusion that Mrs. Wells 11shad knowledge of her ownership rights and was familiar with the leasing and drilling processes (simply by virtue of having executed a mineral lease that was later released), it is clear that this single mother holding a minimum wage job who did not live in the parish in which production was obtained and who never received a penny from that production was reasonable in not pursuing a claim, or more accurately, in-not calling the surface owners or former neighbors to ask whether there has been production, especially where the defendant conceded in argument that the plaintiffs interest was overlooked by his predecessor, implicitly acknowledging thereby that statutorily required notice of unitization and/or production was not provided.
Taking into consideration Mrs. Wells’ education, intelligence, and the defendant’s conduct, the conclusion of the lower courts that Mrs. Wells’ inaction was unreasonable and her ignorance of a potential claim was attributable to her own neglect is not supported by the record. Moreover, we agree with the conclusion in Amoco that there is nothing in the jurisprudence requiring the owner of a mineral servitude to continuously check the property records to determine if new unitized wells are producing from the servitude owner’s property.
Not undermined by Marin’s statement that contra non valentem applies only in “extreme circumstances,” we find the equitable nature of the circumstances in each individual case determines the applicability of the doctrine. Nathan v. Carter, 372 So.2d 560, 563 (La.1979). In this case, the relevant equitable considerations weigh in favor of finding that the running of prescription on plaintiffs claim was suspended by application of contra non valen-tem.
CONCLUSION
|1fiFor the above reasons, we find that prescription was suspended by the application of contra non valentem.
REVERSED AND REMANDED.
Retired Judge H. CHARLES GAUDIN, assigned as Justice ad hoc, sitting for VICTORY, Justice, recused.
GUIDRY, Justice, dissents and assigns reasons.

 Justice Victory recused and Retired Judge H. Charles Gaudin assigned as Justice ad hoc.

. Specifically, LSA-R.S. 30:10 provides, in pertinent part:
A. When two or more separately owned tracts of land are embraced within a drilling unit which has been established by the commissioner as provided in R.S. 30:9(B), the owners may validly agree to pool their interests and to develop their lands as a drilling unit.
(1) Where the owners have not agreed to pool their interests, the commissioner shall require them to do so and to develop their lands as a drilling unit, if he finds it to be necessary to prevent waste or to avoid drilling unnecessary wells.
(a) All orders requiring pooling shall be made after notice and hearing. They shall be upon terms and conditions that are just and reasonable and that will afford the owner of each tract the opportunity to recover or receive his just and equitable share of the oil and gas in the pool without unnecessary expense. They shall prevent or minimize reasonable avoidable drainage from each developed tract which is not equallized by counter drainage.
(2)(a)(i) Any owner drilling or intending to drill a unit well, including a substitute unit well, on any drilling unit heretofore or hereafter created by the commissioner, may, by certified mail, return receipt requested, notify all other owners in the unit of the drilling or intent to drill and give each owner an opportunity to elect to participate in the risk and expense of such well. Such notice shall contain:
(aa) an estimate of the cost of drilling, testing, completing, and equipping the unit well;
(bb) the proposed location of the well;
(cc) the proposed objective depth of the unit well; and
(dd) all logs, core, analysis, production data, and well test data from the unit well which has not been made public.
(ii) ... Failure to give written notice of the election to participate shall be deemed to be an election not to participate.
(3)If there is included in any unit created by the commissioner of conservation one or more unleased interests for which the party or parties entitled to market production therefrom have not made arrangements to separately dispose of the share of such production attributable to such tract, and the unit operator proceeds with the sale of unit production, then the unit operator shall pay to such party or parties such tract’s pro rata share of the proceeds of the sale of production within one hundred eighty days of such sale.