MARC E. JOHNSON, Judge.
lain this tort case, Plaintiff appeals the trial court’s sustaining of Defendants’ exceptions of prescription. For the reasons that follow, we reverse.

FACTS & PROCEDURAL HISTORY

Plaintiff, Francesca Lapuyade, filed suit on October 10, 2012 against Acme Oyster House (“Acme”) alleging she contracted salmonella poisoning after eating a lettuce wedge with blue cheese dressing and artichoke soup at its establishment located on Veterans Blvd. in Metairie on May 6, 2012. She alleged that she became ill the day after eating at Acme and was admitted to East Jefferson General Hospital on May 9, 2012, where she remained for eight days before being discharged on May 17, 2012. Plaintiff asserted Acme was negligént in failing to properly store, handle and prepare the food it served to its customers. Acme answered the lawsuit on December 6, 2012, denying, all allegations.[1]
Almost two years .after the incident, on April 2, 2014, Plaintiff amended her petition to add Little Tokyo Restaurant, Inc. (“Little Tokyo”), Moon Marine USA Corp. (“Moon Marine”), and their insurers as defendants. In the amended petition, Plaintiff alleged that she had dined at Little Tokyo restaurant located on N. Carroll-ton Ave. in New Orleans on April 29, 2012. Although she alleged that her ¡¿treating doctor believed the source of her food poisoning was Acme, which he noted in her medical records, Plaintiff stated that her treating doctor indicated for the first time in October 2013 that there had been a salmonella outbreak at the time Plaintiff became sick that had been traced to a product called “tuna scrape.” Plaintiff asserted that the source of this tuna scrape was Moon Marine, which had distributed its product to Little Tokyo.
Plaintiff again amended her petition on June 26, 2015, adding JFC International, Inc. (“JFC”) as a defendant. Plaintiff alleged. that JFC was advised by Moon Marine in April 2012 to contact its accounts, to which JFC distributed the tuna scrape, and notify the accounts that the tuna scrape had been recalled because an FDA investigation revealed the tuna was potentially ' contaminated with salmonella. Plaintiff asserted that JFC failed to notify Little Tokyo of the recall, which occurred prior to her dining at Little Tokyo and becoming ill.
On February 9, 2015, Moon Marine filed an exception of prescription asserting that *1217 Plaintiffs petition against it was prescribed on its face, as it was not filed within one year from the .date of loss. Moon Marine pointed out that Plaintiff conceded in her amended petition that her initial petition against Acme did not interrupt prescription as to the other defendants because the parties were not joint tortfeasors. Moon Marine argued that the doctrine of contra non valentón, which was pled by Plaintiff in her amended petition, did not apply because Plaintiff could have discovered her claims against Moon Marine had she used reasonable diligence to determine the source of her salmonella infection. Thereafter, JFC and Little Tokyo filed their own exceptions of prescription, adopting Moon Marine’s evidence and argument.
11;After a hearing on Defendants’ exceptions -of.prescription, the trial court sustained the exceptions and dismissed Plaintiffs claims against Defendants with prejudice. Plaintiff appeals the maintaining of the exceptions of prescription.

ISSUES

Plaintiff raises three issues on appeal. First, she argues the trial court erred in finding that her claims against Moon Marine, JFC and Little Tokyo were prescribed. She also contends the trial court erred in ruling on the exceptions of prescription before hearing all the evidence. Second, Plaintiff asserts the trial court erred'in admitting excerpts from Dr. Richard Witzig’s deposition into evidence at the hearing on the exception of prescription bn the basis the requirements of La. C.C.P. art. 1450 were not met. Third, Plaintiff maintains the trial court erred in denying her motion to strike Moon Marine’s exhibit of a Google search screenshot taken from counsel’s cell phone, which was later admitted into evidence.

LAW & ANALYSIS

Admissibility of Dr. Witzig’s Deposition[2]
.Plaintiff argues that the trial court erred in allowing portidns of Dr. Witzig’s deposition that were attached as exhibits to Moon Marine’s exception of prescription into evidence in lieu of live testimony where Moon Marine failed to comply with La. C.C.P. art. 1450.
Article 1450 allows the use of a deposition, or parts thereof, at the trial or hearing of a -motion to be used against any party who'was present or represented at the taking of the deposition or who had reasonable notice under certain circumstances set forth in Subsection A. Plaintiff asserts Moon Marine failed to show that Dr. Witzig was unavailable under Subsection A(3)(a) or that he resided greater than 100 miles from the place of the hearing or was out of state under | (¡Subsection A(3)(b). ■ Plaintiff further maintains Moon Marine failed to give the required notice of. exceptional circumstances under Subsection A(3)(c) or the required notice for using the deposition of an expert witness under Subsection A(5).
In filing its exception of prescription, Moon, Marine attached excerpts of Dr. Witzig’s deposition as an exhibit. In her opposition to the exception, Plaintiff also attached.excerpts, of Dr. Witzig’s deposition as an exhibit. At the very beginning of the hearing on the exception of prescription, Moon Marine made a statement to the trial court referencing Dr. Witzig’s testimony. Plaintiff,objected to Moon Marine’s use of Dr. Witzig’s deposition rather than his live testimony. ■ Moon Marine responded that the testimony was sworn, and the trial court overruled the objection.
Thereafter, Plaintiff proceeded to call her witnesses. . At the conclusion of the *1218 hearing, Moon Marine offered all of the exhibits attached to its exception of prescription and reply to Plaintiffs opposition to its ■ exception into evidence. Plaintiff likewise offered all of her attached- exhibits into evidence. ■ As a result, the trial court admitted all of the exhibits attached to the exception, opposition and reply into evidence.'
The jurisprudence indicates that a party, may waive or be estopped from making.an objection to the admission or exclusion of evidence based-on that party’s failure to object, an act he does or omits before the evidence is offered, or from some affirmative act he does after the court’s ruling on the evidence. Harkins v. MG. Mayer Yacht Services, 05-668 (La. App. 4 Cir. 12/13/06); 952 So.2d 709, 718. In Combs v. Hartford, 544 So.2d 583, 585 (La.App. 1st Cir.1989), writ denied, 550 So.2d 630 (La.1989),. the plaintiff filed a motion in limine seeking to |7exclude certain photographs, which was denied. Plaintiff noted his objection ■ for purposes of appeal. Thereafter, plaintiffs counsel began questioning the plaintiff, about the photographs to which, he had objected, and then introduced the photographs into evidence. The appellate court found that the plaintiff was precluded from assigning error to the inclusion of his own evidence. Additionally, in Acosta v. Lea, 56 So.2d 201 (La. App. 1st Cir.1952), the-appellate court fotmd that the defendant waived his objection to the admission of a withess’ testimony" when the defendant'later Offered the witness and questionéd her about the same conversation to which he had previously objected without qualification and without reserving: his rights under his previous objection. -■ Further, in Hope v. Gordon, 186 La. 697, 173 So. 177, 178 (La.1936), the Louisiana Supreme Court held that “[a] defendant’s objection to a document offered in evidence by plaintiff was waived by defendant’s subsequent offer in evidence of the document which he had sought to exclude.”
Likewise, in the present case, wé find that Plaintiffs affirmative action of offering excerpts from Dr. Witzig’s deposition into evidence, without any qualification after the trial court overruled her objection to Moon Marine’s similar use' of Dr. Wit-zig’s deposition excerpts, waived her right to challenge the admissibility of Dr. Wit-zig’s deposition in lieu of live testimony. Ftírthermore, we note that' Plaintiff had notice that'Moon Marine intended'to use excerpts from Dr. Witzig’s deposition to support its exception of prescription when it attached'the excerpt's as an exhibit to the exception. Under La. !C.C.P. art. 1450(A)(5), Plaintiff had 10 days to object to the use of the deposition and to require live testimony. Instead of objecting, Plaintiff filed an opposition to the exception and attached additional excerpts from Dr. Witzig’s deposition to support her position. Thus, we Lfind no error in the admission of excerpts from Dr. Witzig’s deposition in lieu of live testimony.

Admissibility of Goggle Screenshot

Plaintiff next challenges the admissibility of a copy of a .Google screenshot that purportedly showed the results of a Google search on the basis the screenshot was not authenticated and. constituted hearsay.' '
In its, supporting memorandum, to the exception of prescription, Moon Marine included a screenshot of a Google search in an effort to show .that the source of the salmonella variety that. Plaintiff had contracted, namely Salmonella Bareilly, was readily and easily identifiable through a simple online search. Plaintiff filed a motion to strike Moon Marine’s supporting memorandum on the basis the Google screenshot, which was. contained in the body of the memorandum, was not admissible evidence because it was unauthenti *1219 cated and was hearsay. In response, Moon Marine supplemented its exception of prescription to include a copy of the Google screenshot as an additional exhibit to its exception, as opposed to the screen-shot being a part of its supporting memorandum.
During the hearing on the exception of prescription, Plaintiff objected to the admissibility of the Google, screenshot, arguing that it was unauthenticated and was inadmissible hearsay. The trial court agreed to strike. the photograph of the screenshot, contained in the body of Moon Marine’s supporting memorandum, but declined to strike the entirety of Moon Marine’s supplemental memorandum. The trial court further admitted the exhibit of the Google screenshot into evidence. We agree with Plaintiff that the Google screenshot' was improperly admitted into evidence.
Moon Marine offered the Google screen-shot as evidence of what was readily available to Plaintiff had she conducted an internet search of the specific illness she lahad contracted — Salmonella Bareilly. It maintained that the screenshot showed the top results for a Google search of Salmonella Bareilly during the restricted time period from May 7, 2012 through' May 7, 2013, or the prescriptive period for Plaintiffs cause of action; specifically! Moon Marine maintained the Google search revealed the CDC report which identified the source of the Salmonella Bareilly outbreak as tuna scrape. Moon Marine asserted that this simple internet search would have alerted Plaintiff to timely identify the responsible defendant(s) within the applicable prescriptive period.
In order to be admissible, evidence must be authenticated by extrinsic evidence “sufficient to support a finding that the matter in question is what its proponent claims.” La. G.E. art. 901. In response to Plaintiffs objection to the admissibility of the Google screenshot, Moon Marine simply responded, “it is a simple internet search. You put in date parameters, that is what you get back. I don’t know what is not reliable about it... .1 don’t know how it is not self-authenticating. If you put in that parameter, and put in those two words you will get the same exact result I did. I’ve done it time and time again.” Although counsel from Moon Marine avers that the screenshot is a true and correct copy of .the result yielded through a Google search, counsel did not testify to conducting the search himself and offers no basis for establishing the authenticity or admissibility of the document. While certain documents are self-authenticating, there is no statutory provision providing for‘the self-authentication of the results of a Google search. See La. C.E. art. 902.
Additionally, we find the document to be inadmissible hearsay. Although Moon Marine asserts the document is not being offeréd for the truth of. the matter asserted and therefore does not constitute hearsay, Moon Marine relies on the Google search for its accuracy as to what Plaintiff should have known had she | i nconducted an internet search of her illness. While the screenshot indicates that the Google search was conducted in August 2Q14, there is no indication that a. Google search in 2012 or 2013 would have yielded the same result. , The record is completely devoid of any foundation laid for the admissibility of the evidence. See Crochet v. Wal-Mart Stores, Inc., 2012 WL 489204, *4, 2012 U.S. Dist. LEXIS 18258, *12-13 (W.D.La. Feb. 13, 2012) (agreeing with the defendant’s argument “that plaintiffs’ ‘evidence’ consisting of Google and Yahoo searches is inauthentic, lacks foundation and constitutes inadmissible hearsay”); St. Clair v. Johnny’s Oyster & Shrimp, Inc., 76 F.Supp.2d 773, 775 (S.D.Tex.1999) (“[A]ny evidence procured off the Internet is adequate for almost nothing, even under *1220 the most liberal interpretation of the hearsay exception rules.”) Accordingly, we find the trial court erred in admitting the Google screenshot into evidence.
“Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial fight of the party is affected.” La. C.E. art. 103(A). Erroneous evidentiary rulings are subject to a harmless error analysis. Finch v. ATC/Vancom Mgmt. Srvs. L.P., 09-483 (La.App. 5 Cir. 1/26/10); 33 So.3d 215, 221. Moreover, where evidence is admitted that is merély cumulative of other evidence in the record, any error in its admission is harmless. Id,
The record shows that Dr. Witzig testified he discovered the CDC report through a Google search. Specifically, he testified that he put Salmonella Bareilly into Google and “[i]t came up with a CDC article fight away.” Therefore, we find the screenshot of the Google search results to be cumulative and, therefore, its admission was-harmless.

Prescription

Finally, Plaintiff argues that the trial court erred in sustaining Defendants’ exceptions of prescription. She asserts the doctrine of 'contra non valentem, | n specifically the discovery rule, applies in this case as an exception to the tolling of prescription.' Plaintiff maintains that she reasonably felied on her treating doctor’s opinion that the source of her salmonella poisoning was from food she consumed at Acme. She contends! that she did not learn that the true source of her poisoning was from tuna scrape, which she allegedly came into contact with at Little Tokyo, until speaking with her treating doctor, Dr. Witzig, in October 2013 prior to his deposition. Plaintiff argues that under the discovery rule of contra non valentem, prescription did not run against Defendants until Dr. Witzig advised her that the CDC had identified the source of her salmonella poisoning to be from tuna scrape manufactured by Moon Marine.
Defendants respond by asserting contra lion valentem is' inapplicable because Plaintiff knew she had eaten at Little Tokyo one week before eating at Acme and failed to . disclose it to her doctor or her attorney. They further contend Plaintiff cannot rely on misinformation provided by her doctor and that such reliance fails to satisfy the reasonable diligence requirement of contra non valentem. Defendants assert that the true source of Plaintiffs salmonella poisoning was contained in- a CDC report dated July 2012, which was easily discovered by a -simple internet search.
Delictual actions are subject to a liberative prescription of one year from the date of injury or damage. La. C.C. art. 3492. Although La. C.C. art. 3467 provides that prescription runs against all persons unless excepted by legislation, the jurisprudential doctrine of contra non va-lentem is .an exception to this statutory rule and operates as a means of suspending the running of prescription when the circumstances of a case fall within one of four categories. Wells v. Zadeck, 11-1232 (La.3/30/12); 89 So.3d 1145, 1150. The Louisiana Supreme Court has explained that the doctrine of contra non valentem “is used to . soften the occasional | ^harshness of prescriptive statutes.” Id. Nevertheless, the..supreme court has cautioned that the doctrine, only.applies in exceptional circumstances. Renfroe v. State, ex rel. Dept. of Transp. and Development, 01-1646 (La.2/26/02); 809 So.2d 947, 953.
Contra non valentem applies in four factual situations to prevent the running of prescription: (1) where there was some legal cause which prevented the courts or- their officers from taking cogni *1221 zance of or acting on the plaintiffs actipn; (2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting; (3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and (4) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant. These categories allow “the courts to weigh the ‘equitable nature of the circumstances in each individual case’ to determine whether prescription will be tolled.” Wells, supra at 1150, quoting Plaquemines Parish Commission Council, 502 So.2d 1034, 1054-56 (La. 1987).
The fourth category, also known as the discovery rule, “prevents the running of liberative prescription where the cause of action is not known or reasonably knowable by thé plaintiff.” Cole v. Celotex Corp., 620 So.2d 1154, 1156 (La.1993). Under this category of contra non valentem, prescription begins to run when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he is the victim of a tort. Campo v. Correa, 01-2707 (La.6/21/02); 828 So.2d 502, 510. Constructive knowl-. edge is “whatever notice is enough to excite attention and put the injured party on guard and call for inquiry.” Id. at 510-11, “Prescription will not begin to1 run at the earliest indication that a plaintiff may have suffered some wrong.” Cole, 620 So.2d at 1157.
11sThe Louisiana Supreme Court has observed the difficulty in identifying the precise point in time at which a claimant becomes aware of sufficient facts to begin the running of prescription, and has explained that when prescription begins to run depends on the reasonableness of a plaintiffs action or inaction. Id. “[T]he ultimate -issue in determining whether- a plaintiff had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of the plaintiffs action or inaction in light of his education, intelligence, and the nature of the defendant’s conduct.” Marin v. Exxon Mobil Corp., 09-2368 (La.10/19/10); 48 So.3d 234, 246. Contra non valentem will not apply to exempt a plaintiffs claim from the running of prescription “if his ignorance is attributable to his own willfulness ór neglect; that is, a plaintiff will be deemed to know what he could by reasonable diligence have learned.” Id.
In a peremptory exception of prescription, the mover bears the burden of proof. However, if the petition is prescribed on its face, the burden shifts to the plaintiff to negate the presumption by establishing prescription has been suspended or interrupted. Taranto v. Louisiana Citizens' Property Insurance Corp., 10-105 (La.3/15/11); 62 So.3d 721, 726. When evidence is introduced during a hearing on an exception of prescription, the appellate court must review the entire record to determine whether the trial court’s factual findings were manifestly erroneous. Carter v. Haygood, 04-646 (La.1/19/05); 892 So.2d 1261, 1267.
Plaintiffs amended petition against Defendants is. prescribed on its face, having been filed more than one year after she suffered food poisoning. Thus, she. bore the burden of proving her claims were not prescribed.-
Plaintiff, who was 26 years old at the time of the illness and was a high school graduate with some college education, testified at the prescription hearing. She stated that she had eaten a blue cheese lettuce wedge and a cup of artichoke | usoup at-Acme on a Sunday night with her friend, Jeff Bordelon. She stated that she becamé sick the next day with stomach *1222 cramps and hot and cold flashes, and her mother brought her to the hospital on Wednesday. Plaintiff recounted her discussions with Dr. Elizabeth McDonald, a gastroenterologist, at the hospital. According . to Plaintiff, Dr. McDonald inquired about her food history. Plaintiff explained that she told Dr. McDonald about eating at home, the Jazz Fest, Acme, Little Tokyo, and some nuts from Whole Foods. Plaintiff noted that Dr. McDonald focused on the nuts because she thought Plaintiff had some kind of; diverticulitis and seemed interested in festivals and.whether Plaintiff had been out of the. country. Plaintiff stated that Dr. McDonald did not focus on the rolls she ate at Little Tokyo because the rolls weré cooked and she never ate anything raw.
Plaintiff explained that Dr. Witzig, an infectious disease doctor, was consulted about her illness and both he and Dr. McDonald reviewed her history. Plaintiff stated that after taking her food history, which included Little Tokyo, Dr. Witzig explained to her that the incubation period for salmonella poisoning was between 12 and 24 hours and that there was no doubt in his mind that the lettuce wedge she ate at Acme was the cause of her salmonella poisoning. Dr. Witzig explained the concept of cross-contamination to Plaintiff, telling her that the lettuce itself did not have salmonella but' that it would have soaked up the salmonella from another nearby source. Plaintiff testified that Dr. Witzig was not intérested in' her meal at Little Tokyo because of the incubation period.
Plaintiff further testified that she had not been sick prior to eating at Acme. Specifically, Plaintiff stated that she'was not sick between eating at Little Tokyo and eating at Acme. She also stated -that her friend, Jeff Bordelon, with whom she had eaten at Little Tokyo and Acme, did not get sick after eating at Little Tokyo. Plaintiff submitted excerpts of Mr. Borde-lon’s deposition in which he testified that 11fithat he suffered some stomach issues, including' intense cramping, on Tuesday after eating at Acme with Plaintiff on Sunday. ■ '
Plaintiffs mother, Toni Lapuyade, corroborated Plaintiffs testimony regarding the food history given to the doctors at the hospital. Ms. Lapuyade, who was with Plaintiff for most of her time in the hospital, testified . that Little Tokyo was discussed with the doctors, but the doctors did not focus on it because they were more concerned with the six to 72 hours prior to Plaintiff becoming ill. Ms. Lapuyade stated that Dr. Witzig definitively told them that Plaintiffs salmonella poisoning was caused by the lettuce she ate at Acme.
Plaintiff also submitted portions of her medical records into evidence. Dr. Wit-zig’s consultation report dated May 14, 2012 showed a history that Plaintiff became ill 18 to 24 hours after eating at Acme. Dr. Witzig’s report specifically stated, “The timing around her event and the type of food eaten almost certainly implicates the Acme Oyster House.” He further opined that Plaintiff’s salmonella “is most likely ,a non typhoidal Salmonella food-borne transmitted strain, as assessed by her symptomatology, her incubation period and her epidemiological risk factors.” The medical .records show that the sero-type of salmonella, Bareilly, was -identified and noted on June 25,2Q12..
Dr. Witzig testified by deposition that “the overwhelming amount of time that Salmonella will manifest itself is really within three days.” While Dr. Witzig admitted that the incubation period for Salmonella Bareilly can go as long as 16 days, he noted that such incubation period is very unusual. When asked if it was more likely than not that Plaintiff contracted salmonella at Little Tokyo rather than *1223 Acme, Dr. Witzig disagreed basing his opinion on the typical incubation period.
Dr. Witzig also testified about the CDC article he found through a Google search that addressed the source of the Salmonella Bareilly. The CDC article, | 1fiwhich was submitted into evidence, shows that there was a multistate outbreak of Salmonella Bareilly and Salmonella Nchanga associated with a raw scraped tuna product. In its final update of July 26, 2012, the CDC indicated that a total of 410 persons, including six from Louisiana, were infected with Salmonella Bareilly. The CDC stated that its investigation linked the outbreak to a frozen raw yellowfin tuna product, known as Nakaochi Scrape, from Moon Marine USA Corporation, and that Moon Marine had voluntarily recalled the product on April 13, 2012.
From the. record, it is unclear when Dr. Witzig found the CDC article or what caused him to conduct the Google search. However, it is clear that he had the CDC article when he first met with Plaintiffs counsel in October 2013. Dr. Witzig admitted that the information of the original source of the salmonella would have been available to him by the summer of 2012 had he looked into it, but explained that “these things often take months to be digested by the state [a]nd then' by clinicians.”
Given these facts, we must now determine Plaintiffs reasonableness in relying on her treating physician regarding the cause of her salmonella poisoning and failing to further investigate the source of the salmonella so as to identify the responsible parties within the one-year prescriptive period. The reasonableness of Plaintiffs actions centers upon the knowledge she possessed in light of her .education .and intelligence. Wells, 89 So.3d at 1152.
In In re Medical Review Panel of Howard, 573 So.2d 472. (La.1991), the supreme court addressed the issue of whether the plaintiffs medical malpractice claim against certain defendants.for causing the wrongful death of her husband was barred by prescription. The. plaintiffs husband was treated at a hospital for multiple stab wounds but died the next day. The plaintiff timely filed a claim against the hospital alleging that her husband’s death was caused by the negligence 117of the hospital employees or of other persons for whom the hospital was responsible. A medical review panel was convened and the hospital submitted a memorandum to the panel. This memorandum, filed more .than two years after the husband’s death, was the plaintiffs first notification that the doctor who treated her husband in the emergency room was not an employee of the hospital but rather was .an employee of a medical group which contracted with the hospital to provide professional services in the hospital’s emergency department. More than two years after her husband’s death, the plaintiff filed a supplemental claim requesting the medical review panel review the responsibility of the medical group and the physician who treated her husband.
The medical group filed an exception of prescription that was maintained by the trial court and upheld, by. the appellate court. . The supreme court reversed the lower courts’ rulings, finding that the doctrine of contra non valentem applied to suspend the running of prescription. The supreme court found that the plaintiff reasonably believed that her husband was treated by employees of the hospital when he presented himself: for treatment. Although the court noted that the plaintiff could have utilized discovery to determine the names of the health care- providers, it found that it was not necessary for her to do so if the providers ¡were hospital employees, which the plaintiff reasonably believed to be the case. The supreme court held that prescription was suspended-until the plaintiff was made aware that the med *1224 ical group, and not the hospital, was vicariously responsible for the torts of the emergency room doctor.
"Additionally, in Griffin v. Kinberger, 507 So.2d 821 (La.1987), the supreme court found that, under the doctrine of contra non valentem, the plaintiffs’ action was not prescribed despite being filed 18 years after their premature child suffered eye problems after being given oxygen at birth. The mother of the infant child, |i8who only had a sixth grade education, noticed the child’s eye problems, but the doctor told her that the condition was the natural and expected consequence of the necessary administration of oxygen to a premature child at birth. Eighteen years later, the mother read a newspaper article about a child’s blindness caused by a Florida doctor’s negligent treatment with, oxygen during a premature birth. The supreme court held that until the mother was alerted by the newspaper article, she had no reason to relate her child’s eye symp-. toms to any malpractice, especially since the doctors told the plaintiffs that the symptoms were the normal result of the administration of oxygen.
Further, in Carter v. Grant, 97-2106 (La.App. 4 Cir. 10/25/00); 772 So.2d 885, writs denied, 00-3190 and 00-3209 (La. 1/12/01); 781 So.2d 563, the court concluded that the plaintiffs claim, filed three years after her initial diagnosis, was not prescribed when she relied on her treating physician’s diagnosis that she had AIDS, when in fact she did not. The court noted that the doctors had the expertise to decipher medical testing results, the first two of which indicated a positive AIDS test. A third test, which was performed at the plaintiffs request, was negative for AIDS. At that time the doctors recommended an antigen test, which was performed more than one year after the negative test result and which came back negative. The court found that the plaintiff, who had a tenth grade education, had no reason to doubt her treating physician’s diagnosis. The court found that the doctrine of contra non valentem suspended prescription until the antigen test came back negative because it was the antigen test results that alerted the plaintiff of the possibility that the first positive AIDS test was incorrect.
Likewise, in the present case, we find Plaintiff had no reason to doubt her treating physician’s opinion regarding the cause of her salmonella poisoning. Dr. Witzig was an infectious disease doctor who was specially called to'consult on [^Plaintiffs case after the emergency room doctor and the gastroenterologist could not determine what was wrong with her.. Dr. Witzig testified that most salmonella cases have an incubation period of three days. As such, he believed Plaintiffs salmonella poisoning was caused by the food she consumed at Acme the day before she became sick. Even after acknowledging that Salmonella Bareilly could have an incubation period of up to 16 days, Dr. Witzig disagreed with a statement that it was more probable that Plaintiffs salmonella was caused by food she ate at Little Tokyo one week prior to getting sick as opposed to food she ate at Acme the night before getting sick. He explained his disagreement by stating that cases with a 16-day incubation period are very unusual.
Additionally, Plaintiffs friend ate with her at Little Tokyo and Acme. Neither Plaintiff nor her friend became sick after eating at Little Tokyo. However, both became sick after eating atAcme. .
Under the circumstances of this case, wé find that Plaintiff reasonably relied on her treating physician regarding the cause of her salmonella poisoning and that her ignorance of the involvement of Moon Marine, Little Tokyo and/or JFC in the salmonella outbreak was not willful or inexcusably negligent. Nothing in the record *1225 shows that Plaintiff had any reason to doubt her treating doctor as to the cause of her illness, which was documented in her medical records. We find that the doctrine of contra non valentón applies in this case and suspended the running of prescription until October 2013, when Plaintiff was made aware by Dr. Witzig that the CDC had identified the source of the salmonella outbreak as tuna scrape. Plaintiff filed suit against Defendants on April 2, 2014, within one year of learning of her cause of action against Defendants.

DECREE

hnAcgordingly, the judgment of the lower court maintaining Moon Marine, Little Tokyo, and JFC’s exception's of prescription is reversed. Defendants’ exceptions of prescription are hereby overruled, and the case is remanded for further proceedings. Defendants are to bear the costs of this appeal.

REVERSED

, Acme subsequently filed a motion for summary judgment that was granted on July 21, 2015, resulting in Plaintiff's claims against Acme being dismissed with prejudice. Plaintiff initially appealed this judgment in the present appeal; however, in her appellate brief, Plaintiff indicated that she no longer wished to appeal the granting of summary judgment in favor of Acme and did not raise any assignments of error relating to the judgment.

. We address Plaintiffs assignments of error out of order for ease of analysis.