# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 15, 2021

Lyle W. Cayce
Clerk

No. 20-30365

Juanea L. Butler, *individually and as representative of all others similarly situated*,

*Plaintiff—Appellant*,

*versus*

Denka Performance Elastomer, L.L.C.; E. I. DuPont de Nemours & Company; State of Louisiana, *through the* Department of Health, *incorrectly named as* Louisiana State through the Department of Health and Hospitals; State of Louisiana, *through the* Department of Environmental Quality; Dupont Performance Elastomers, L.L.C., *formerly known as* DuPont Dow Elastomers, L.L.C.,

*Defendants—Appellees.*

Appeal from the United States District Court
for the Eastern District of Louisiana
USDC No. 2:18-CV-6685

Before Haynes, Higginson, and Oldham, *Circuit Judges*.
Stephen A. Higginson, *Circuit Judge*:

In this environmental tort case, Juanea Butler alleges that neoprene production from the Pontchartrain Works Facility exposed residents of St.

No. 20-30365

John the Baptist Parish, Louisiana, to unsafe levels of chloroprene, which she contends may result in a myriad of adverse health conditions including an elevated risk of cancer.  Butler sued Denka Performance Elastomer and DuPont—the current and former owners of the facility—as well as the Louisiana Departments of Health ("DOH") and Environmental Quality ("DEQ") in state court seeking class certification, damages, and injunctive relief for various state tort claims.

Following removal, the district court denied Butler's motion to remand to state court;[1] granted each of the defendants' motions to dismiss because Butler's claims were either time-barred or failed to state a plausible claim;[2] denied in part Butler's motion for leave to amend as futile;[3] and dismissed the amended petition for failure to state a claim.[4]  Butler appeals each ruling.[5]

## I.

DuPont owned and operated the Pontchartrain Works Facility ("PWF") from 1969 until 2015, when DuPont sold the plant to Denka.  For decades, it is alleged, the plant has emitted unsafe levels of chloroprene into

---

[1] *Butler v. Denka Performance Elastomer, LLC* (*Butler I*), No. 18-CV-6685, 2019 WL 92659 (E.D. La. Jan. 3, 2019), *reconsideration denied,* No. 18-CV-6685, 2019 WL 697164 (E.D. La. Feb. 20, 2019).

[2] *Butler II*, No. 18-CV-6685, 2019 WL 1160814 (E.D. La. Mar. 13, 2019).

[3] *Butler III*, No. 18-CV-6685, 2019 WL 2417500 (E.D. La. June 10, 2019), *rev'g in part,* No. 18-CV-6685, 2019 WL 8888172 (E.D. La. Apr. 16, 2019).

[4] *Butler IV*, No. 18-CV-6685, 2020 WL 2747276 (E.D. La. May 27, 2020).

[5] This is Butler's second appeal.  She first appealed a subset of the district court's orders on April 11, 2019, while her motion for leave to amend her complaint was still pending.  Consequently, and because no final judgment had been entered, this court dismissed the appeal for lack of appellate jurisdiction. *Butler V*, 806 F. App'x 271, 272 (5th Cir. Mar. 20, 2020) (per curiam) (unpublished).

No. 20-30365

the air, exposing nearby residents in the vicinity to adverse health effects. Though DuPont sold the neoprene manufacturing facilities of the PWF to Denka, it retained ownership of the underlying land and buildings.

On June 5, 2018, Butler filed her initial class action petition in Louisiana state court.[6] She complains only of the chloroprene released as a result of the facility's neoprene production, and both the PWF's owners and the state's alleged failure to regulate those emissions.

Butler acknowledges that she is not the first to complain about these chloroprene emissions. The district court, accepting as true as it must the allegations in Butler's complaint and undisputed by the parties on appeal, summarized the relevant background as follows:

> In December 2015, the Environmental Protection Agency ("EPA") released a screening-level National Air Toxics Assessment ("NATA"), and classified chloroprene as a likely human carcinogen. EPA's NATA evaluation suggested an acceptable risk exposure threshold for chloroprene: 0.2 µg/m³; that is, chloroprene emissions should stay below .2 micrograms per cubic meter to comply with the limit of acceptable risk threshold (which is a risk of 100 in one million people).

> The EPA held its first Parish community meeting to discuss the potential chloroprene emission issues on July 7, 2016. At that meeting, a DOH representative advised that children should not breathe chloroprene. In August of 2016, Denka began 24-hour air sampling every six days. Samples collected at five sampling sites are and continue to exceed the 0.2 µg/m³ threshold. According to Denka's own sampling

---

[6] Butler subsequently amended the class definition in a First Amended Petition, also in state court, on June 11, 2018. We refer to the initial and first amended petitions, collectively, as "FAP."

numbers for chloroprene concentrations, the average chloroprene concentration across all sampling sites from August 2016 to March 2017 has ranged from 4.08 µg/m³ to 6.65 µg/m³.

The EPA has noted that, in addition to the high risk of cancer from exposure to chloroprene, symptoms include: headache, irritability, dizziness, insomnia, fatigue, respiratory irritation, cardiac palpitations, chest pains, nausea, gastrointestinal disorders, dermatitis, temporary hair loss, conjunctivitis, and corneal necrosis.

The EPA has further detailed that acute exposure may: damage the liver, kidneys, and lungs; affect the circulatory system and immune system; depress the central nervous system; irritate the skin and mucous membranes; and cause dermatitis and respiratory difficulties in humans.

On October 7, 2016, Denka submitted modeling results for chloroprene concentrations surrounding the PWF to the Louisiana Department of Environmental Quality ("DEQ") for the period of 2011 through 2015, showing concentrations well above the 0.2 µg/m³ threshold. At a meeting on December 8, 2016, DEQ Secretary Chuck Brown dismissed those expressing concern about the chloroprene concentrations as "fearmongerers" and said "forget about 0.2[µg/m³]."

The EPA's National Enforcement Investigation Center ("NEIC") conducted a Clean Air Act ("CAA") inspection of the Pontchartrain Works facility in June 2016. A copy of the redacted inspection report from the EPA's CAA inspection was publicized on April 3, 2017. The NEIC inspection report revealed various areas of non-compliance by both DuPont and Denka in their operation of the facility, including failure to adhere to monitoring, recordkeeping, and reporting requirements for the chloroprene vent condenser; failure to replace leaking valves; failure to include appropriate emissions factors in air permit application materials; and failure to

No. 20-30365

institute appropriate emissions controls for the chloroprene Group I storage tank.

*Butler II*, 2019 WL 1160814, at *1–2.

Butler herself is a resident of LaPlace, Louisiana, in St. John the Baptist Parish. Since 1998, she has resided and worked within 5.5 miles of the PWF. Butler alleges that DuPont and Denka have emitted, and continue to emit, chloroprene at levels resulting in concentrations exceeding the upper limit of acceptable risk. Specifically, she alleged in paragraph 24 of her initial complaint:

> Due to the Plaintiff's exposure to the chloroprene emissions, she has experienced symptoms attributable to exposure of said chemical. Since April 2012 until current date, the Plaintiff has continually sought medical attention for the following conditions: acute bronchitis; coughing; throat irritation; redness and swelling; nasal blockage, congestion, and sneezing; sinusitis and nasal polyps; exacerbation of pre-existing asthma; shortness of breath; wheezing; rhinosinusitis; thyroid enlargement; cardiac problems; nausea; vomiting; headaches; fatigue; epistaxis (nose bleeds); anxiety; depression; insomnia; and temporary hair loss.[7]

Butler also seeks to represent a putative class on behalf of:

> (1) Those persons who, at any time from January 1, 2011 through the present, have lived, worked, attended school,

---

[7] Both the district and magistrate judges below discerningly highlight that Butler omitted these specific allegations in her second amended petition ("SAP") in lieu of more generalized descriptions of her symptoms. As a result, Butler's SAP alleges only that she "has experienced the symptoms and/or medical conditions and/or illnesses; and exposure referenced in the said class definition," without referring to a specific onset date. The magistrate judge nonetheless considered the omitted allegations in Butler's initial "verified complaint," including Butler's alleged onset date of April 2012, as "an affidavit." Absent any argument to the contrary, we do the same here.

No. 20-30365

and/or actually resided within a geographical boundary of St. John the Baptist Parish . . .; and

(2) who experienced one or more of the following physical symptoms: headaches; sinus problems; dizziness; insomnia; trouble breathing; respiratory irritation, or other respiratory problems; chest pains; acute cardiac palpitations; acute gastrointestinal disorder; acute bronchitis; acute onset of asthma; exacerbation of pre- existing asthma; fatigue; nausea; skin rash; temporary hair loss; chronic coughing; chronic nasal discharge; chronic cardiovascular disorder; chronic throat irritation; chronic eye irritation; chronic thyroid disorder; anxiety; and depression, resulting from their exposure to chloroprene or other chemical substance released from the Pontchartrain Works Facility.[8]

Butler asserts various state tort claims against each of the defendants, and seeks class certification, damages, declaratory relief, and injunctive relief including an abatement of chloroprene releases from the PWF.

The district court ultimately dismissed Butler's claims against DuPont and DOH as prescribed by Louisiana's one-year limitations period, reversed in part the magistrate judge's order granting leave to add strict liability claims against DuPont and dismissed those claims as futile, and dismissed the remaining continuing tort claims against Denka for failure to state a plausible claim. Judgment was entered in favor of the defendants on June 4, 2020, and this appeal timely followed.[9]

---

[8] The putative class definition remained substantively identical in the SAP, except that Butler revised the last sentence to specify that the exposure includes "chloroprene *(chlorobutadiene, C4H5Cl) and/or chloroprene-containing substances emitted, released, or/or leaked from the PWF*." This amendment is immaterial to our analysis.

[9] We note that, independent of the issues presented in this appeal, there are similar cases pending in state and federal court asserting claims relating to the PWF's chloroprene

No. 20-30365

II.

Butler first challenges the district court's denial of her motion to remand the case to state court, which we review de novo. *Waste Mgmt., Inc. v. AIG Specialty Ins. Co.*, 974 F.3d 528, 532 (5th Cir. 2020).

Denka and DuPont timely removed the case to federal court under the Class Action Fairness Act, 28 U.S.C. § 1332(d), and the district court concluded that minimal diversity existed between Butler, a Louisiana citizen, and DuPont, a Delaware citizen based on its state of incorporation and the location of its corporate headquarters. On appeal, Butler argues that the district court lacked subject matter jurisdiction and that the state agency defendants are immune from suit in federal court. She primarily asserts that at the time of removal, DOH and DEQ had not waived immunity, and alternatively that their post-removal waiver was not authorized by the state legislature.

While Butler's primary challenge is based on sovereign immunity, her premise that she could not file this suit in federal court in the first instance misunderstands CAFA. CAFA significantly expanded federal diversity jurisdiction over interstate class action claims.[10] Contrary to Butler's

---

emissions. We express no opinion as to the merits of those claims, and address only Butler's asserted claims here. *See, e.g.*, Order and Reasons, *Gerard v. Denka Performance Elastomer LLC*, No. 18-cv-5739 (E.D. La. Oct. 15, 2018), ECF No. 8 (granting motion to remand to state court); Scheduling Order, *Taylor v. Denka Performance Elastomer LLC*, No. 17-cv-7668 (E.D. La. Apr. 6, 2020), ECF No. 126 (setting bench trial on nuisance claims for April 4, 2022); Order, *Acosta v. Denka Performance Elastomer, LLC*, No. 21-30136 (5th Cir. June 10, 2021), ECF No. 51 (staying proceedings in related appeal).

[10] *See* Class Action Fairness Act of 2005, Pub. L. No. 109-2, § 2, 119 Stat. 4 (2005) ("The purposes of this Act are to . . . restore the intent of the framers of the United States Constitution by providing for Federal court consideration of interstate cases of national importance under diversity jurisdiction."); *id.* §§ 4-5 (amending federal court subject matter and removal jurisdiction as codified in 28 U.S.C. §§ 1332, 1453).

assertions, CAFA expanded district courts' "original jurisdiction" to include "any civil action in which the matter in controversy exceeds the sum or value of $5,000,000, . . . and is a class action in which[] any member of a class of plaintiffs is a citizen of a State different from any defendant." 28 U.S.C. § 1332(d)(2)(A).

As the district court concluded, CAFA's "minimal diversity" requirement is satisfied because Butler is a resident and citizen of Louisiana, and DuPont is a citizen of Delaware. *See In re Katrina Canal Litig. Breaches*, 524 F.3d 700, 705 (5th Cir. 2008); 28 U.S.C. § 1332(d)(2)(A). It is true that even under CAFA, "a state is not a citizen" for diversity purposes. *In re Katrina Canal Litig.*, 524 F.3d at 706. However, a state's presence does not affect CAFA's minimal—rather than complete—diversity requirement. *See id.*

Butler next contends that removal was improper because the state defendants had not waived their sovereign immunity at the time of removal. Not so. CAFA permits removal by "any defendant *without the consent* of all defendants." 28 U.S.C. § 1453(b) (emphasis added); *cf.* 28 U.S.C. § 1446(b)(2)(A) (requiring that "all defendants who have been properly joined and served must join in or consent to the removal of the action" under § 1441(a)). This rule allows defendants to remove a case to federal court without first obtaining consent—and therefore waiver of sovereign immunity—from any joined state defendants, which is what occurred here. While it is true that under CAFA, "a state may find itself in a case removed to federal court without having joined in the removal," this procedure does not itself infringe the state's sovereign immunity because the "state, having taken no affirmative act, has not waived immunity and can still assert it." *Frazier v. Pioneer Ams. LLC*, 455 F.3d 542, 547 (5th Cir. 2006) (citing *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 616 (2002)). Consequently, "CAFA, like other statutes, provides jurisdiction over cases in which states

may, if they choose, be defendants, thus respecting state dignity interests." *Id.*; *accord In re Katrina Canal Litig.*, 524 F.3d at 706 (holding that CAFA's expanded jurisdiction "does not tax the [state's] immunity," even when the state was involuntarily removed to federal court).

Butler further argues that removal was barred by the Eleventh Amendment, which grants states (and qualifying state agencies) immunity from suits brought by citizens in federal court. *Lapides*, 535 U.S. at 616 (citing *Hans v. Louisiana*, 134 U.S. 1 (1890)). However, it is well established that states can waive this immunity. *Id.* at 618 ("A State remains free to waive its Eleventh Amendment immunity from suit in a federal court."). A state's voluntary appearance in federal court, including through removal, constitutes such waiver. *Id.* at 619–20. Such a waiver is precisely what occurred here: DEQ and DOH—both represented by the state's attorney general—expressly waived their Eleventh Amendment immunity in opposing Butler's motion to remand.

Notwithstanding this express consent, Butler argues that Louisiana has categorically rejected any waiver of its sovereign immunity, and that neither the DEQ, DOH, nor the attorney general has authority to waive sovereign immunity or consent to federal court jurisdiction. Butler relies on Louisiana Revised Statutes section 13:5106(A), which states: "No suit against the state or a state agency or political subdivision shall be instituted in any court other than a Louisiana state court."

Butler's arguments are unavailing. To start, we have previously interpreted section 13:5106(A) narrowly as recognizing Louisiana's waiver of "its immunity in state, but not federal, court." *Frazier*, 455 F.3d at 547.

Moreover, the Supreme Court rejected a nearly identical argument by the State of Georgia in *Lapides v. Board of Regents of the University System of Georgia*. In that case, Georgia's attorney general consented to removal of a

professor's lawsuit for state and federal claims against the Georgia state university system and university officials. *Lapides*, 535 U.S. at 616, 622. Following removal, Georgia sought to invoke its sovereign immunity to dismiss the claims. *Id.* at 616–17. The Supreme Court held that Georgia's voluntary invocation of federal jurisdiction by consenting to removal constituted waiver. *Id.* at 620–24. In doing so, the Court rejected Georgia's argument that the attorney general did not have statutory authority to "waive the State's Eleventh Amendment immunity. . . even after it removed its case to federal court[.]" *Id.* at 621–22. The Court emphasized that "[a] rule of federal law that finds waiver through a state attorney general's invocation of federal-court jurisdiction avoids inconsistency and unfairness," as opposed to a rule that "denies waiver despite the state attorney general's state-authorized litigating decision." *Id.* at 623.[11] *Lapides* likewise controls here.[12]

Accordingly, we agree with the district court that removal was proper pursuant to CAFA, and the state agencies have consented to federal jurisdiction thereby waiving any sovereign immunity in this case.

---

[11] *Lapides* acknowledged that it did not consider whether its holding would apply to federal claims against a state defendant, or where the state has not waived its underlying sovereign immunity from suit in *state* courts. *Lapides*, 535 U.S. at 617–18; *accord Meyers ex rel. Benzing v. Texas*, 410 F.3d 236, 247 (5th Cir. 2005) (extending *Lapides*'s "voluntary invocation principle and its waiver-by-removal rule" as "fully applicable to suits based on federal-law claims"). This is of no concern here because this case is squarely controlled by *Lapides*: Butler alleges only state tort claims, and no party argues that Louisiana prohibits such claims against state defendants in state court. To the contrary, Butler asserts the opposite in arguing for remand.

[12] Butler does not contest that the Louisiana attorney general is authorized to represent DEQ and DOH in this litigation. *See Meyers*, 410 F.3d at 247 ("[A] rule of federal law that finds waiver through invocation of federal court jurisdiction *by an attorney authorized to represent the state in the pertinent litigation* would avoid inconsistency and unfairness." (emphasis added) (citing *Lapides*, 535 U.S. at 622–24)); *see also* La. R.S. 49:257(A) ("[T]he attorney general shall represent the state and all departments and agencies of state government in all litigation arising out of or involving tort. . . .").

No. 20-30365

### III.

Satisfied of our jurisdiction, we turn to the merits. We review the district court's dismissal for failure to state a claim de novo, "applying the same standard applied by the district court." *Masel v. Villarreal*, 924 F.3d 734, 742–43 (5th Cir. 2019), *as revised* (June 6, 2019). A denial of a motion to amend the complaint is reviewed for abuse of discretion, but when the denial is based on the futility of amendment for failure to state a claim upon which relief could be granted, as here, we review that denial de novo under the same standards as a dismissal under Rule 12(b)(6). *Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 766 (5th Cir. 2016).

### A.

Butler first challenges the dismissal of her claims against DuPont and DOH as time-barred. Butler alleges that DuPont, as the former neoprene manufacturer until 2015 and current owner of the PWF's land and buildings, is liable for various tort claims arising from the chloroprene emissions. She also claims that DOH failed to adequately warn Butler and the community about the dangers of chloroprene exposure and failed to fully investigate the health effects of chloroprene. We first consider whether Butler's allegations on their face are prescribed, and second, whether any tolling of prescription applies.

### 1.

Under Louisiana's civil code, Butler's alleged tort claims are "subject to a liberative prescription of one year," which "commences to run from the day injury or damage is sustained." La. Civ. Code art. 3492. "When damages are not immediate, the action in damages is formed and begins to prescribe only when the tortious act actually produces damage and not on the day the act was committed." *Tenorio v. Exxon Mobil Corp.*, 170 So. 3d 269, 274 (La. Ct. App. 2015). An injury or damage is sustained "when it has

11

No. 20-30365

manifested itself with sufficient certainty to support accrual of a cause of action." *Id.* "'The burden of proof is normally on the party pleading prescription; however, if on the face of the petition it appears that prescription has run, . . . the burden shifts to the plaintiff to prove a suspension or interruption of the prescriptive period' based on the equitable doctrine of *contra non valentem*." *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 995 F.3d 384, 388–89 (5th Cir. 2021) (quoting *Younger v. Marshall Indus. Inc.*, 618 So. 2d 866, 869 (La. 1993)); *accord Hogg v. Chevron USA, Inc.*, 45 So. 3d 991, 998 (La. 2010).

Butler filed her initial complaint in state court on June 5, 2018. Therefore, for Butler's claims to be timely, the prescription period must have begun or been tolled until June 5, 2017. Butler alleged that she began seeking treatment for symptoms of chloroprene exposure in April 2012, which is the date her injury first accrued. Thus, unless tolled, the one-year prescription expired well before Butler filed suit six years later.

2.

We next consider whether Butler has met her burden in proving that prescription was tolled under the doctrine of *contra non valentem*. *In re Taxotere*, 995 F.3d at 388–89. At the pleadings stage, she has.

*Contra non valentem*[13] is an equitable doctrine that tolls prescription where, *inter alia*, "the cause of action is neither known nor reasonably knowable by the plaintiff." *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 245 (La. 2010). Under this doctrine, "the prescriptive period begins to run 'on the date the injured party discovers or should have discovered the facts upon

---

[13] From the Latin expression *contra non valentem agere nulla currit praescriptio* ("Prescription does not run against a party unable to act"). *Crier v. Whitecloud*, 496 So. 2d 305, 307 & n.4 (La. 1986).

which his cause of action is based.'" *Chevron USA, Inc. v. Aker Mar., Inc.*, 604 F.3d 888, 893 (5th Cir. 2010) (quoting *Griffin v. Kinberger*, 507 So. 2d 821, 823 (La. 1987)). The exact time at which prescription begins to run "depends on the reasonableness of a plaintiff's action or inaction." *Knaps v. B & B Chem. Co.*, 828 F.2d 1138, 1140 (5th Cir. 1987) (per curiam) (quoting *Jordan v. Emp. Transfer Corp.*, 509 So. 2d 420, 423 (La. 1987)).

Consequently, prescription begins only "when a plaintiff obtains actual or constructive knowledge of facts indicating to a reasonable person that he or she is the victim of a tort." *Campo v. Correa*, 828 So. 2d 502, 510 (La. 2002). "Constructive knowledge is whatever notice is enough to excite attention and put the injured party on guard and call for inquiry. Such notice is tantamount to knowledge or notice of everything to which a reasonable inquiry may lead." *Id.* at 510–11. "That means prescription runs 'from the time there is notice enough to call for *inquiry* about a claim, not from the time when the inquiry reveals facts or evidence sufficient to *prove* the claim.'" *In re Taxotere*, 995 F.3d at 391 (quoting *Terrel v. Perkins*, 704 So. 2d 35, 39 (La. Ct. App. 1997)). Under this standard, "a plaintiff will be deemed to know what he could have learned with reasonable diligence." *Tenorio*, 170 So. 3d at 274.

Butler first contends *contra non valentem* applies because she was not "aware in April 2012 that her symptoms were caused by chloroprene, much less that acts of [DuPont] and DOH were causing her symptoms." But *actual* knowledge is not required.

Butler next contends that she lacked even constructive knowledge that the chloroprene emissions from PWF caused her symptoms. "[T]he ultimate issue in determining whether [Butler] had constructive knowledge sufficient to commence a prescriptive period is the reasonableness of [Butler's] action or inaction in light of [her] education, intelligence, and the

nature of the defendant's conduct." *Wells v. Zadeck*, 89 So. 3d 1145, 1151 (La. 2012) (quoting *Marin*, 48 So. 3d at 246). Consequently, "the reasonableness of the plaintiff's actions centers upon the knowledge she possessed." *Id*. at 1152.[14]  Louisiana courts consistently consider "the reasonableness of a plaintiff's action or inaction" based on the position she is in—including the information known or otherwise available to her at the time. *See Jordan*, 509 So. 2d at 423; *see also Knaps*, 828 F.2d at 1140; *Lennie v. Exxon Mobil Corp.*, 251 So. 3d 637, 646 (La. Ct. App. 2018).

Butler's specific allegations as to the onset of her symptoms attributable to chloroprene and her ensuing treatment are admittedly thin.[15] However, at the pleadings stage, Butler need only allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Here, consistent with the pleadings standard in which we must "accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff," *Thompson v. City of Waco*, 764 F.3d 500, 502 (5th Cir. 2014), she has alleged enough.

While Butler's FAP alleged that she began experiencing symptoms in April 2012 that were ultimately linked to chloroprene exposure—i.e. "[d]ue to Plaintiff's exposure to the chloroprene emissions"—more facts are necessary to determine *when* she received notice of such linkage. Contrary to defendants' urging, we decline to read the complaint's phrasing of "due to"

---

[14] This reasonableness standard does not require Butler to have known in April 2012 that her symptoms were attributable to chloroprene emissions from the PWF, which would be more akin to an *actual* knowledge standard. *See, e.g.*, *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 300 (5th Cir. 1999) ("To decide otherwise would be to say that a plaintiff must *know* the cause of her damage, taking away the constructive knowledge component of the rule.").

[15] *See supra* n.7

so narrowly to mean that Butler knew, in 2012, that chloroprene caused her symptoms. Indeed, at oral argument, Butler's counsel clarified that Butler's symptoms "were not linked to chloroprene until much, much later."[16]

DuPont rightfully concedes that its stronger argument is that Butler—at some point after she first started seeking medical treatment—was on constructive notice that chloroprene *may have been* responsible for her symptoms. But that fact-bound conclusion is not evident to us at the pleadings stage.[17] While conclusive proof as to the cause of Butler's symptoms is not required to satisfy constructive notice that begins the prescriptive period, there must be "enough notice to call for an inquiry about a claim." *Luckett v. Delta Airlines, Inc.*, 171 F.3d 295, 300 (5th Cir. 1999) ("The commencement of prescription does not necessarily wait for the pronouncement of a victim's physician or of an expert. . . . [T]he prescriptive period commences when there is enough notice to call for an inquiry about a claim, not when an inquiry reveals the facts or evidence that specifically outline the claim." (internal citations omitted)). On the record before us, we

---

[16] We understand why the district and magistrate judges reached the opposite conclusion based on the imprecise pleading in Butler's FAP and SAP implying that Butler was aware, as of April 2012, that her symptoms was attributable to chloroprene exposure. Indeed, this may be determinative following discovery, where both parties will have the opportunity to develop the facts relating to Butler's medical treatment history. Similarly, the parties can probe, as the district court postulated, whether "[s]eeking medical attention for approximately 20 symptoms consistently for years would put a reasonable person on guard to inquire into why she is suffering persistently with so many symptoms." *Butler II*, 2019 WL 1160814, at *4.

[17] Indeed, the Louisiana cases primarily relied on by the parties were decided only after an evidentiary hearing on prescription. *See, e.g.*, *Wells*, 89 So. 3d at 1147–48; *Tenorio*, 170 So. 3d at 274; *Lennie*, 251 So. 3d at 644–46; *Guerin v. Travelers Indemnity Co.*, 296 So. 3d 625, 628 (La. Ct. App. 2020). Likewise, the federal cases we find instructive were similarly decided on motions for summary judgment. *See, e.g.*, *In re Taxotere*, 995 F.3d at 388; *Luckett*, 171 F.3d at 300; *Jenkins v. Bristol-Myers Squibb Co.*, 689 F. App'x 793, 795 (5th Cir. 2017); *Crochet v. Bristol-Myers Squibb Co.*, 804 F. App'x 249, 250 (5th Cir. 2020).

cannot say at what point Butler received such notice. Indeed, that may be dispositive upon further discovery of Butler's medical treatment history as to what she learned, and when she learned it. *Compare, e.g.*, *Jenkins v. Bristol-Myers Squibb Co.,* 689 F. App'x 793, 796–97 (5th Cir. 2017), *with Crochet v. Bristol-Myers Squibb Co.*, 804 F. App'x 249, 252–55 (5th Cir. 2020).

Moreover, DuPont and DOH primarily rely on cases in which a plaintiff's *diagnosis*, more than one year prior to filing suit, constitutes constructive notice. But that distinction is critical, and supports our contrary holding here. Significantly, as alleged in her pleadings, Butler was not diagnosed or otherwise told that her symptoms were a result of excessive chloroprene emissions more than one year prior to filing suit. *Cf. Tenorio*, 170 So. 3d at 275 ("[Plaintiff's] *diagnosis* was constructive notice sufficient to put [him] on guard and to call him to inquire into the cause of his condition." (emphasis added)); *Lennie*, 251 So. 3d at 648 ("Mr. Lennie's *diagnosis* of lung cancer in January 2010 was constructive notice sufficient to put the [plaintiffs] on guard and to call for them to inquire further into the cause of his condition." (emphasis added)); *Guerin v. Travelers Indem. Co.*, 296 So. 3d 625, 631 (La. Ct. App. 2020) ("[Plaintiff's] *diagnosis* in 2015 was constructive notice sufficient to put him on guard and to call him to inquire into the cause of his condition." (emphasis added)).[18]

---

[18] Again, defendants DuPont and DOH's reliance on these cases for the proposition "that medical diagnosis triggers the duty to inquire" is inapt, as Butler does not allege that she was ever diagnosed. Indeed, even years of seeking and receiving medical treatment leading up to a diagnosis does not necessarily trigger the running of prescription. *See Zumo v. R.T. Vanderbilt Co.*, 527 So. 2d 1074, 1077–78 (La. Ct. App. 1988) (holding, on summary judgment, that prescription did not begin to run on plaintiff's claim that exposure to workplace chemicals caused his skin cancer until his cancer diagnosis, even though he had been diagnosed with chronic dermatitis and first learned he was allergic to those chemicals four years earlier).

No. 20-30365

At oral argument, DuPont attempted to distinguish these cases by asserting that "latent" "cellular level diseases like cancer" require a diagnosis before prescription runs, but that Butler's symptoms were "severe" "overt injuries" sufficient to constitute constructive notice without a diagnosis. We choose not to reach such an intensely fact-based distinction at the pleadings stage and on the sparse record before us. This further demonstrates why discovery—at least as to prescription—is warranted here.

Finally, our conclusion is further bolstered by defendants' consistent *denial* that chloroprene—either in April 2012 or in the years since—*caused* any of Butler's symptoms. In other words, absent a diagnosis or any facts that Butler received sufficient notice linking her symptoms to chloroprene, and drawing all reasonable inferences in Butler's favor at the pleadings stage, we cannot conclude that Butler had constructive notice more than one year prior to filing suit. Consistent with Louisiana's *contra non valentem* analysis as to what Butler reasonably knew or should have known at the time, we disagree that, on the record before us, Butler had constructive knowledge sufficient to trigger the running of prescription over a year before she filed suit in June 2018. *See Wells*, 89 So. 3d at 1151. Accordingly, we reverse the district court's holding that Butler's claims were prescribed.[19]

B.

Second, Butler appeals the denial of her motion to amend her complaint to assert a claim against DuPont for the *ongoing* chloroprene

---

[19] DOH alternatively argues that Butler's claims against it are prescribed based on its July 2016 community meeting and subsequent actions. However, the reasonableness of whether Butler could or should have discovered, or attended, these community meetings is likewise dependent on undeveloped facts, especially the circumstances of her medical treatment.

emissions. Specifically, Butler claimed that DuPont and Denka were strictly liable for the PWF's ongoing chloroprene emissions from PWF's "defective" neoprene production units pursuant to Louisiana Civil Code Articles 2317 and 2317.1. Butler alleged that DuPont "owned and operated the entire PWF from 1969 to 2015," when it sold the PWF to Denka. After the sale, "*except for the neoprene manufacturing units of the PWF* . . . DuPont retained ownership of the entirety of the PWF land and buildings, including the building where it currently manufactures Kevlar." Thus, Butler asserts, DuPont and Denka are both liable because "during separate periods of time, [they] have had ownership, care, custody, and control of the neoprene units of the PWF; and DuPont has maintained care, custody, and control of the PWF since 1969."

The first requirement for strict (custodial) liability is that "[t]he *thing* which caused injury must be in the care, custody and control of the defendant." *Palermo v. Port of New Orleans*, 951 So. 2d 425, 438 (La. App. 2007) (emphasis added); *accord Fruge ex rel. Fruge v. Parker Drilling Co.*, 337 F.3d 558, 565 (5th Cir. 2003). "Louisiana courts have generally held that (1) ownership of a thing establishes a rebuttable presumption of custody or 'garde,' and (2) in a case of non-ownership, a defendant may be found to have custody over property when he exercises direction and control of the thing and derives some benefit from it." *Coulter v. Texaco, Inc.*, 117 F.3d 909, 913 (5th Cir. 1997); *accord Davis v. Riverside Court Condo. Ass'n Phase II, Inc.*, 154 So. 3d 643, 648 (La. App. 2014) ("[I]n determining whether a thing is in one's custody or *garde*, courts should consider (1) whether the person bears such a relationship as to have the right of direction and control over the thing; and (2) what, if any, kind of benefit the person derives from the thing."

(alteration in original) (quoting *Dupree v. City of New Orleans*, 765 So. 2d 1002, 1009 (La. 2000))).[20]

We agree with the district court that the "thing" Butler must show "custody" of to succeed on her custodial liability claim is the PWF's "neoprene production units," rather than the land itself. Under Articles 2317 and 2317.1, the defective "object" is distinct from the property on which the injury occurred, unless an inherent defect in the property caused the injury. *Compare Doughty v. Insured Lloyds Ins. Co.*, 576 So. 2d 461, 464 (La. 1991) (defective machinery located on the property was considered "the object," not the property itself), *with Dupree*, 765 So. 2d at 1005 (property *was* considered "the object" where cause of the injury was the property itself: a cave-in on a New Orleans city street). Butler does not argue that the PWF as a whole or the underlying land caused the "defect," but rather that "both DuPont and Denka have *garde* over the neoprene units and other sources of chloroprene emissions at DuPont's PWF."

The district court next concluded that Butler failed to allege *garde* over the neoprene production units after 2015 because "mere ownership" of the land and buildings is "insufficient to state a plausible strict or custodial liability claim against DuPont when [Butler's] own allegations state that, since 2015, Denka alone had custody over and operated the objects allegedly causing the harm, the allegedly faulty neoprene units operated during the manufacturing process." *Butler III*, 2019 WL 2417500, at *5.

Generally, "[d]etermining who has the custody or garde of the thing is a fact driven determination." *Dupree*, 765 So. 2d at 1009. Here, Butler

---

[20] Neither Butler nor DuPont addresses, or appears to contest, whether DuPont "derives some benefit" from Denka's ownership and operation of the PWF's neoprene production units. Rather, they focus only on whether DuPont has or can exercise sufficient "custody" or "control."

principally argues that because DuPont retained ownership of the land and buildings, it likely retained some contractual control over Denka's neoprene production as well. For example, Butler's counsel asserted at oral argument that "it would seem a logical inference that DuPont still has some rights over what Denka is doing on DuPont's property." DuPont, in response, argues that Butler fails to allege any facts to support that, aside from ownership of the land, DuPont retains control or custody over PWF's neoprene production units.

We need not resolve whether Butler alleges enough, here, to support her contention that DuPont has *garde* over PWF's neoprene production units. For the reasons that follow, Butler's custodial liability claims against DuPont fail for the same reason as her claims against Denka: a failure to state a plausible duty and corresponding breach. *See Socorro v. City of New Orleans*, 579 So. 2d 931, 937 (La. 1991) (finding no liability even though the defendant had *garde* over the injury-causing defect).

## C.

Next, Butler appeals the dismissal of her negligence and strict custodial liability claims against Denka arising from its past and current neoprene manufacturing at the PWF. Butler says that Denka "has failed to exercise reasonable care to prevent [the] emission of unreasonably dangerous chloroprene concentrations into the air," and that "Denka's neoprene manufacturing equipment is unreasonably dangerous, because of its excessive chloroprene emissions." Though not prescribed because of the

No. 20-30365

continuing tort doctrine, the district court granted Denka's motion to dismiss for failure to state a plausible claim.[21]  We agree.

1.

As to the negligence claims, Butler asserts that Denka unreasonably emits dangerous chloroprene concentrations in violation of Louisiana Civil Code Articles 2315 and 2316.  Those articles provide that "[e]very act whatever of man that causes damages to another obliges him by whose fault it happened to repair it," LA. CIV. CODE art. 2315(A), and that "[e]very person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill," LA. CIV. CODE art. 2316.  Under Louisiana law's duty-risk analysis of negligence liability, Butler must prove five separate elements:  "(1) the defendant had a duty to conform his conduct to a specific standard (the duty element); (2) the defendant's conduct failed to conform to the appropriate standard (the breach element); (3) the defendant's substandard conduct was a cause in fact of the plaintiff's injuries (the cause-in-fact element); (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries (the scope of liability or scope of protection element); and (5) the actual damages (the damages element)." *Lemann v. Essen Lane Daiquiris*, 923 So. 2d 627, 633 (La. 2006).  Duty is the "threshold issue."  *Id.*

As to strict custodial liability, Butler argues that Denka is the owner or custodian of a defective thing—the neoprene manufacturing equipment—

---

[21] The district court dismissed Butler's claims against Denka in her FAP for failure to state in a claim on March 13, 2019, *Butler II*, 2019 WL 1160814, at *7, and then dismissed Butler's amended claims in her SAP for largely similar reasons on May 27, 2020, *Butler IV*, 2020 WL 2747276, at *1.  Because the dismissal orders largely overlap, we draw primarily from the final dismissal order.  Like the district court, despite Butler's inexcusable neglect in filing her second amended petition ten days late, we address the merits of Denka's motion to dismiss.

in violation of Louisiana Civil Code Articles 2317 and 2317.1. Those articles provide that "[w]e are responsible, not only for the damage occasioned by our own act, but for that which is caused by . . . the things which we have in our custody," LA. CIV. CODE art. 2317, and that "[t]he owner or custodian of a thing is answerable for damage occasioned by its ruin, vice, or defect, only upon a showing that he knew or, in the exercise of reasonable care, should have known of the ruin, vice, or defect which caused the damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care," LA. CIV. CODE art. 2317.1; *accord Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 616 (5th Cir. 2018) (citing *Bufkin v. Felipe's La., LLC*, 171 So. 3d 851, 855 (La. 2014)).

"Strict liability" is a misnomer, however, because Article 2317.1's knowledge requirement "effectively eliminated strict liability . . . turning it into a negligence claim." *Renwick*, 901 F.3d at 617 n.12 (quoting *Burmaster v. Plaquemines Parish Gov't*, 982 So.2d 795, 799 n.1 (La. 2008)). Accordingly, a claim for "strict" liability requires that a duty of care was breached, just as a negligence claim does. *Bd. of Comm'rs v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 729 n.52 (5th Cir. 2017) (citing *Oster v. Dep't of Transp. & Dev.*, 582 So. 2d 1285, 1288 (La. 1991)). "There is essentially no difference between the two types of claims under Louisiana law . . . ." *Id.* at 729.

2.

Here, Butler fails to adequately allege a duty owed by Denka, and consequently whether Denka breached such a duty. Thus, both the negligence and strict liability claims fail to state a plausible claim.

Butler repeatedly references the EPA's NATA recommended "acceptable risk" chloroprene emissions threshold of 0.2 µg/m³ (micrograms per cubic meter). The district court dismissed Butler's

invocation of that threshold as a legal duty because it is "less than a federal regulation" and even the EPA "disclaims" it as an "absolute risk measure" of toxicity. *Butler IV*, 2020 WL 2747276, at *10–11. The district court concluded that Butler "fails to allege that [Denka] had a duty to conform its conduct to a specific legally-enforceable standard (or any corresponding duty to warn the plaintiff concerning its business operations) and that it breached that duty." *Id.* at *9. Thus, the court concluded that Butler's "allegations concerning [Denka's] duty and breach are conclusory and speculative" because her "theory that [Denka] owed a duty not to exceed a certain level of emissions and breached that duty is not plausible." *Id.* at *12.[22]

On appeal, Butler now disclaims any reliance on the EPA's stated risk threshold. Although Butler sought to enjoin Denka from emitting chloroprene "in excess of 0.2 micrograms (mcg) per cubic meter into the air," she now contends that the district court "misconstrued" her petitions.[23] Instead, Butler asserts that Denka violated Louisiana's general duty "to use reasonable care to avoid injury to another." *Rando v. Anco Insulations, Inc.* 16 So. 3d 1065, 1086 (La. 2009). She says Denka's

---

[22] The district court further noted that Butler's allegations were belied by another source incorporated by reference in her SAP: the OSHA "Hazardous Substances Data Bank" report, which includes a permissible exposure limit of "25 parts per million, or 90 milligrams per cubic meter, which is the equivalent of 90,000 micrograms per cubic meter." *Id.* at *12. The court emphasized that the OSHA report's conflicting "acceptable" exposure limit "detracts from [Butler's] attempt to plausibly suggest that .2 micrograms per cubic meter represents a 'safe' exposure threshold." *Id.*

[23] For example, Butler's FAP initially sought to enjoin Denka from emissions of chloroprene "in excess of 0.2 micrograms (mcg) per cubic meter into the air." Her SAP likewise relies on NATA's 0.2 micrograms threshold, and seeks to enjoin Denka from emitting "chloroprene into the air from the PWF at levels in excess of 0.2 micrograms (mcg) per cubic meter or at levels in excess of what this Court otherwise finds to be safe."

No. 20-30365

chloroprene emissions—untethered from any particular emissions threshold—are nonetheless unreasonably excessive.

While we remain skeptical of Butler's contention that the district court misconstrued her claims,[24] Butler's retreat to generalized grievances is unavailing. While Louisiana law does impose a "universal duty" on defendants in a negligence action to use "reasonable care," *Rando*, 16 So. 3d at 1086, plaintiffs are still required to assert a "specific standard" of care. *See Lemann*, 923 So. 2d at 633.[25] The inquiry into a defendant's particular duty

---

[24] For example, in her opening brief on appeal, Butler asserts that although Denka is "familiar with the NATA findings" which "established a chloroprene concentration acceptable risk threshold of not more than .2 micrograms per cubic meter of air," the chloroprene emissions at PWF "are hundreds of times *that* acceptable risk threshold." Moreover, Butler's attempt to change course on appeal is not well taken. In general, we do "not allow a party to raise an issue for the first time on appeal merely because a party believes that he might prevail if given the opportunity to try a case again on a different theory." *Leverette v. Louisville Ladder Co.*, 183 F.3d 339, 342 (5th Cir. 1999) (internal quotation marks and citation omitted).

[25] Even the case Butler principally relies on defines with specificity the relevant duty applicable to the employment context of that case. *See Rando*, 16 So. 3d at 1086–87 (describing specific statutory duties owed by employers pursuant to Louisiana Revised Statute § 23:13, industry standards related to asbestos, and the state legislature's "inclusion of asbestosis as an occupational disease" in concluding that the employer owed a duty of care to its employee regarding asbestos exposure). So too for each of the cases Butler cites. *See, e.g., Rathey v. Priority EMS, Inc.*, 894 So.2d 438, 466 (La. 2005) (describing specific duty of care owed by an EMT during a medical emergency); *Davis v. Witt*, 851 So. 2d 1119, 1127–28 (La. 2003) (concluding, in a wrongful death negligence suit following a truck collision, that the trial judge erred "because he failed to fit the duty of the dispatcher within the parameters the courts of this state have set with regard to law enforcement personnel under circumstances that do not constitute an emergency"); *id.* at 1128–29 (describing detailed jurisprudential duties of commercial truck drivers); *Joseph v. Dickerson*, 754 So. 2d 912, 916 (La. 2000) (noting that a car owner had a duty, as described in the Restatement (Second) of Torts § 390 (1965), not to negligently entrust her vehicle to her daughter); *Boykin*, 707 So. 2d at 1231 (identifying the undisputed and specific duty of Department of Transportation and Development "to design and provide a signal-controlled intersection that did not present an unreasonable risk of harm to motorists and pedestrians").

"is whether the plaintiff has any law (statutory, jurisprudential, or arising from general principles of fault) to support the claim that the defendant owed him a duty." *Id.*; *accord Boykin v. La. Transit Co.*, 707 So. 2d 1225, 1230 (La. 1998) (emphasizing that in a "proper duty-risk analysis" the court should first identify "the duty imposed upon the defendant by statute or rule of law"). "Whether a legal duty exists, and the extent of that duty, depends on the facts and circumstances of the case, and the relationship of the parties." *Joseph v. Dickerson*, 754 So. 2d 912, 916 (La. 2000).

Here, Butler relies not on the EPA, OSHA, or other agencies' recommended emissions thresholds but on generalized pronouncements that Denka has violated its duty to take "reasonable care." Yet, Butler points to no "statutory," "jurisprudential," or any other source of law—and we have likewise found none—in which such generalized references to "excessive emissions," "acceptable risk threshold," and "unreasonably dangerous emissions," constitutes a sufficient legal duty to support a negligence or custodial liability claim. *See Bd. of Comm'rs v. Tenn. Gas Pipeline Co.*, 850 F.3d 714, 727–28 (5th Cir. 2017) (dismissing negligence and strict liability claims asserting that defendant companies' dredging caused erosion and costly flood protection measures because plaintiffs failed to allege an applicable legal duty under the federal and state statutory and regulatory schemes governing the state's waterways).[26]

---

[26] As it is not before us in this appeal, we express no opinion on the district court's conclusion that the EPA's or other agencies' stated acceptable emissions thresholds cannot constitute a legal duty under Louisiana law. We also note that there is a dearth of Louisiana case law on a defendant's legal duty regarding the emission of chemicals. None of the parties asks us to certify to the Louisiana Supreme Court whether Louisiana law recognizes such a duty as alleged here, and we decline to *sua sponte* certify such a question at this time in light of our conclusion that Butler fails to assert any such theory here and has largely abandoned the arguments she asserted in the district court. Our ruling here is thus based

No. 20-30365

Consequently, we agree with the district court that Butler fails to allege a duty, or a breach of such duty, based on Denka's alleged "excessive" chloroprene emissions.  Absent a showing of duty or breach, we need not address the district court's alternative holding as to causation or injury.  *See Lemann*, 923 So. 2d at 633 ("A negative answer to any of the inquiries of the duty-risk analysis results in a determination of no liability.").  Butler's custodial liability claims fail for the same reason.  *See Tenn. Gas Pipeline Co.*, 850 F.3d at 729.

## D.

Finally, Butler appeals the dismissal of her declaratory relief claims against DEQ.[27]  Butler alleged that DEQ failed to warn the community of the risks of chloroprene exposure, provide notice concerning the high levels of chloroprene emissions, and abide by its statutory duties to conduct routine sampling and testing of hazardous waste from the PWF.  On appeal, she

---

on a straightforward application of federal pleading standards: by failing to allege *any* specific duty that has been violated, she fails to state a plausible claim for relief. Accordingly, we do not risk an *Erie* guess as to whether Louisiana law would, "[i]n deciding whether to impose a duty in a particular case, . . . make a policy decision in light of the unique facts and circumstances presented." *Lemann*, 923 So. 2d at 633. *See also Mckesson v. Doe*, 141 S. Ct. 48, 51 (2020) (per curiam) (remanding to certify to the Louisiana Supreme Court "novel issues of state law peculiarly calling for the exercise of judgment by the state courts" as to whether Louisiana imposes a duty of care on certain speech-related activity that is not protected by the First Amendment because the "constitutional issue . . . is implicated only if Louisiana law permits recovery under these circumstances in the first place"); *id.* ("[C]ertification is advisable before addressing a constitutional issue"). We express no opinion on whether certification would be appropriate in a suitable case.

[27] Butler does not meaningfully challenge the district court's dismissal of Butler's negligence claims against DEQ based on its statutory duties pursuant to Louisiana Revised Statutes sections 30:2001-02 and 2011-12 and that it allegedly shielded Denka from liability. Butler's vague and unsupported arguments are deemed abandoned on appeal. *See* Fed. R. App. P. 28(a)(8); *see also In re Deepwater Horizon*, 819 F.3d 190, 194 n.3 (5th Cir. 2016); *In re Repine*, 536 F.3d 512, 518 n.5 (5th Cir. 2008).

asserts that "DEQ is violating Plaintiff's Louisiana constitutional rights by subjecting her to harmful concentrations of chloroprene," and seeks a judgment declaring the same.

The district court dismissed Butler's claims against DEQ because she failed to comply with the agency's administrative process, including the agency's authority to issue declaratory rulings prior to seeking a declaratory judgment in court, pursuant to Louisiana Revised Statutes section 30:2050.10(C).

On appeal, Butler barely acknowledges the district court's detailed explication of the applicable law, regulations, and administrative procedures—instead referring to them as "irrelevant." Rather, Butler cursorily insists that she is entitled to declaratory relief under the Louisiana Constitution and Louisiana Code of Civil Procedure Article 1871. Butler does not brief how these provisions interact with, let alone supersede, the state's significant regulatory framework, and we need not address such inadequately briefed arguments here. *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir. 1994) ("A party who inadequately briefs an issue is considered to have abandoned the claim.").

## IV.

For the foregoing reasons, the judgment of the district court is REVERSED in part and AFFIRMED in part, and REMANDED for further proceedings consistent with this opinion.

HAYNES, *Circuit Judge*, concurring in part, dissenting in part:

I respectfully dissent from Sections III.B and III.C of the majority opinion and the corresponding portion of the judgment. As the majority opinion demonstrates, we lack understanding of Louisiana law on the scope of a defendant's legal duty regarding the emission of chemicals. To determine whether certification is appropriate, we weigh three factors: (1) "the closeness of the question[s]"; (2) federal–state comity; and (3) "practical limitations," such as the possibility of delay or difficulty of framing the issue. *Swindol v. Aurora Flight Scis. Corp.*, 805 F.3d 516, 522 (5th Cir. 2015) (quotation omitted). The Rules of the Louisiana Supreme Court allow us to certify dispositive questions of Louisiana law on our own accord if there is a lack of "clear controlling precedent" from the Louisiana Supreme Court. *McKesson v. Doe*, 141 S. Ct. 48, 50 (2020) (per curiam) (quotation omitted). I discuss these points below.

As demonstrated by the majority opinion, we lack controlling precedent concerning this novel and important question of state law, making is a "close question." Indeed, it concedes, "[t]here is a dearth of Louisiana case law on a defendant's legal duty regarding the emission of chemicals." Op. at 25 n.26. The precedent we do have is of limited utility.

In *Rando v. Anco Insulations Inc.*, 16 So.3d 1065 (La. 2009), the Louisiana Supreme Court held that a defendant-employer had a duty to protect a plaintiff-employee from exposure to asbestos—despite there being no law or regulation at the time of the exposure regarding the harm of asbestos—because the defendant "knew or should have known of the dangers of asbestos exposure at the time of [the plaintiff's] employment." *Id.* at 1087. While *Rando* is helpful to our analysis (and, frankly, is more supportive of Butler's view than Denka's), the Louisiana Supreme Court has never addressed whether, and to what extent, this duty applies outside of the

employment law context.[1]  A further review of the existing law indicates that there are no "clear controlling precedents" from the Louisiana Supreme Court that discuss the full scope of this duty.  As such, it is appropriate for us to certify the question sua sponte.

The question of whether an emitter has a duty to limit emissions to a level it should have known would not harm human health is an important one that can substantially affect residents of the particular state, so under our federal-state comity, I conclude that we should defer to the Louisiana Supreme Court on this topic.  Moreover, certification of a question to a state supreme court is particularly appropriate where, as here, the dispute presents novel issues of state law, calling for the exercise of judgment by the state courts.  *See Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974).  As the majority opinion notes, Butler's negligence claim does not rely on any statutory or jurisprudential law to establish duty.  Rather, Butler relies on the general principle that individuals have a duty to take "reasonable care."  Where, as here, the plaintiff states a generalized duty, the court must determine "whether the rule is intended to protect him from the particular harm alleged."  *In re FEMA Trailer Formaldehyde Prods. Liab. Litig.*, 838 F. Supp. 2d 497, 505 (E.D. La. 2012) (citing *Meany v. Meany*, 639 So.2d 229, 233 (La. 1994)).  In doing so, courts "may consider various moral, social, and economic factors."  *Meany*, 639 So.2d at 233.  As such, in deciding legal duty questions, courts are required to "make a policy decision in light of the unique facts and circumstances presented."  *Lemann v. Essen Lane Daiquiris, Inc.*, 923 So. 2d 627, 633 (La. 2006).

---

[1] Admittedly, Louisiana law provides a more specific legal duty for employers towards their employees.  *See Rando*, 16 So.3d at 1086 (citing LA. REV. STAT. ANN. § 23:13).

No. 20-30365

The determination of a legal duty question presents a paradigmatic situation of a case calling for the exercise of judgment by state courts. *See Lehman Brothers*, 416 U.S. at 391. Indeed, the Supreme Court recently remanded to the Fifth Circuit to certify a novel question on duty under Louisiana negligence law to the Louisiana Supreme Court. *See McKesson*, 141 S. Ct. at 51 (2020). At bottom, certification in this case would allow Louisiana courts to properly exercise their judgment on novel issues of state law.

Additionally, the question of whether Denka owed Butler a legal duty is directly dispositive of Butler's claims (assuming arguendo that Butler has sufficiently pleaded breach, causation, and damages).[2] Therefore, whether or not Denka has a legal duty—regarding the emission of excessive chemicals that it allegedly should have known could have carcinogenic effects—will determine the outcome of this case, with respect to Denka.

---

[2] Independent of the certification issue, I respectfully dissent from the majority opinion's conclusion that Butler's pleadings fail to allege a duty or a breach of such duty. Though plaintiffs must plead a "specific standard" of care, *Lemann*, 923 So. 2d at 633, it appears that Butler has done so—contending that "Denka has failed to exercise reasonable care to prevent emission of unreasonably dangerous chloroprene concentrations into the air where Plaintiff lives." This standard is hardly new; Louisiana imposes "an almost universal duty" on defendants in negligence cases "to use reasonable care." *Rando*, 16 So. 3d at 1086.

The majority opinion takes issue with Butler's "generalized pronouncements" of a duty; however, whether a legal duty exists under Louisiana law, is dependent "on the facts and circumstances of the case." *Joseph v. Dickerson*, 754 So. 2d 912, 916 (La. 2000). Butler has not had the opportunity to take relevant discovery that could bolster her claims and allow her to define with specificity the relevant duty and breach. Therefore, Butler cannot be faulted for lacking supporting factual evidence before discovery has even begun. As such, Butler's allegations are sufficient—particularly at the 12(b)(6) stage—to allege duty and breach.

No. 20-30365

As far as practicality, there is no indication that the Louisiana Supreme Court would unduly delay the case—it handles cases promptly.

In summary, it is surprising to say that, because we do not know what the law is on this, we are going to let emitters spew pollution harming individuals without recourse.[3]    This case therefore has wide-ranging implications on future plaintiffs' ability to pursue similar claims under Louisiana law.  The majority opinion's declination to certify this question could prevent future plaintiffs from filing suit against alleged environmental contaminators, merely because they lack detailed information on the emitter's specific actions prior to discovery.

For the foregoing reasons, I conclude that we should certify this issue to the Louisiana Supreme Court: whether an emitter has a duty (the failure of which gives rise to a cause of action by an individual who was harmed) to fail to emit pollutants above a level that causes harm to human health.  *See In re Katrina Canal Breaches Litig.*, 613 F.3d 504, 509 (5th Cir. 2010) ("[C]ertification may be advisable where important state interests are at stake and the state courts have not provided clear guidance on how to proceed." (quotation omitted)); *see also Jesco Const. Corp. v. NationsBank Corp.*, 278 F.3d 444, 448 (5th Cir. 2001) (same).  I therefore dissent from Sections III.C and III.B and the corresponding portion of the judgment; I otherwise concur.

---

[3] Because this case is at the Rule 12(b)(6) stage, we must accept the allegations as true.  Of course, I recognize that, if the Louisiana Supreme Court found that the law provides a cause of action, the facts may not be proven or may be contrary to Butler's allegations.

Andrew S. Oldham, *Circuit Judge*, dissenting in part:

I respectfully dissent from section III.A of the majority's opinion. Butler has not met her burden to prove tolling of the prescription period. I would affirm the district court's holding that Butler's claims against DuPont and DOH were time-barred.

The majority concludes Butler's injury accrued—and prescription began to run—in April 2012 when she began seeking medical treatment. With that much, I agree. But the majority then concludes that Butler is entitled to tolling of the prescription period because, at the pleadings stage, there is not enough evidence to put her on constructive notice that chloroprene was responsible for her symptoms. There are five problems with that.

First, Butler's own pleadings contained facts sufficient to establish constructive notice. Under Louisiana law, constructive notice includes "notice of everything to which a reasonable inquiry may lead." *Campo v. Correa*, 828 So. 2d 502, 511 (La. 2002). And here, Butler alleged numerous public facts that any reasonable inquiry would uncover:

- In 2010, EPA concluded chloroprene is likely carcinogenic.

- In December 2015, EPA classified chloroprene as a likely human carcinogen.

- In July 2016, EPA held a public meeting in Butler's community to discuss potential chloroprene emission issues.

- In December 2016, at a school board meeting, the community discussed—and community members expressed concern about—local chloroprene concentrations.

- In January 2017, Denka made an agreement with DEQ to reduce its chloroprene emissions by 85%.

- And in April 2017, EPA released a redacted copy of an inspection report, which revealed numerous areas of non-compliance at the facility.

Butler did not file suit until June 5, 2018. So it was her burden to prove that tolling lasted until June 5, 2017. But every one of the above facts points to an earlier date. Butler's own petition reveals what a reasonable inquiry would have uncovered and when it would have uncovered it.

Second, the efforts that led Butler to learn these facts by June 2018 could have led her to discover them sooner. That matters because the limitations period is more likely to bar relief when the petition's allegations are "based on the same facts" that the plaintiff "could have discovered had [she] investigated" earlier. *Marin v. Exxon Mobil Corp.*, 48 So. 3d 234, 250 (La. 2010); *accord Wells v. Zadeck*, 89 So. 3d 1145, 1152 (La. 2012) (noting inaction is reasonable when a plaintiff is "prevented from filing [a] claim" because the cause of action is not "reasonably knowable by the plaintiff"). But there's nothing to suggest the facts that formed the basis of Butler's petition in 2018 were not reasonably knowable well before then. She doesn't point to anything that would have made these facts undiscoverable until June 2017. So the very same efforts she eventually made could have been made earlier.

Third, the majority concludes that Butler is entitled to discovery to determine "what she learned, and when she learned it." *Ante*, at 16. But this confuses actual and constructive notice. Any information uncovered in discovery only could show Butler's *actual* knowledge. But that's beside the point. "It is not necessary to have actual knowledge as long as there is constructive knowledge." *Tenorio v. Exxon Mobil Corp.*, 170 So. 3d 269, 274 (La. Ct. App. 2015). Butler is "deemed to know" every fact she "could have learned with reasonable diligence." *Ibid.* Whether and when she did in fact know is irrelevant.

Fourth, the absence of a formal diagnosis can't rescue Butler's claims. Prescription runs "from the time there is enough notice to call for *inquiry* about a claim, not from the time when the inquiry reveals facts or evidence sufficient to *prove* the claim." *In re Taxotere (Docetaxel) Prods. Liab. Litig.*, 995 F.3d 384, 391 (5th Cir. 2021). A medical diagnosis is not a prerequisite—it's just one form of notice. And here, notice came in a different form: As the district court concluded, "[s]eeking medical attention for approximately 20 symptoms consistently for years would put a reasonable person on guard to inquire into why she is suffering persistently with so many symptoms." *Butler v. Denka Performance Elastomer LLC*, 2019 WL 1160814, at *4 (Mar. 13, 2019). And to the extent Butler argues her symptoms were unexplained without a diagnosis, her own allegations again fill the gap: She alleged she experienced a fear of cancer from her symptoms and medical treatment. The mental link she formed between her symptoms and the possibility of cancer was enough to "put [her] on guard and to call h[er] to inquire into the cause of h[er] condition." *Tenorio*, 170 So. 3d at 275.

Finally, the majority makes much of the fact that this case is only at the pleadings stage. And it rightly notes we must "accept all well-pleaded facts as true and view all facts in the light most favorable to the plaintiff." *Thompson v. City of Waco*, 764 F.3d 500, 502 (5th Cir. 2014). But that makes no difference either, because it's the very facts Butler pleaded that make her ineligible for tolling. If we accept all her facts as true, it only establishes that she had constructive notice long before she sued.

For these reasons, Butler cannot meet her burden to prove prescription was tolled. She's pleaded facts that establish constructive notice well before she filed suit. And further discovery won't do anything to erase the facts she alleged. I would affirm the district court's judgment.